773 A.2d 535

ROUSE-FAIRWOOD DEVELOPMENT
LIMITED PARTNERSHIP,

v.

SUPERVISOR OF ASSESSMENTS FOR
PRINCE GEORGE'S COUNTY.

No. 611, Sept. Term, 2000.

Court of Special Appeals of Maryland.

May 31, 2001.

590

Kurt J. Fischer (Evelyn W. Pasquier and Piper, Marbury, Rudnick & Wolfe, LLP, on the brief), Baltimore, for appellant.

David M. Lyon, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Argued before HOLLANDER, ADKINS and JAMES S. GETTY (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This case, which is before us for the second time, concerns the imposition of an Agricultural Land Transfer Tax ("Ag Tax") of $408,377.50, as well as a penalty of $40,837.75, triggered when the Supervisor of Assessments (the "Supervisor")

of Prince George's County (the "County"),[1] appellee, removed the agricultural use assessment that benefitted three contiguous parcels of land owned by Rouse Fairwood Limited Partnership ("Rouse"), appellant. The properties were found disqualified for the agricultural use assessment after they were rezoned to Mixed Use Community property ("M–X–C"), at Rouse's request. The removal of the agricultural use assessment led to the imposition of the Ag Tax and penalty. The Tax Court upheld the Ag Tax and penalty, which led to Rouse's first appeal. *See Rouse-Fairwood Limited Partnership v. Supervisor of Assessments of Prince George's County,* 120 Md. App. 667, 708 A.2d 19 (1998) (*"Rouse I "*).

Following our remand in *Rouse I,* the Tax Court again upheld the Ag Tax and penalty, by Order dated November 4, 1999. Thereafter, pursuant to an opinion of May 12, 2000, the Circuit Court for Prince George's County affirmed. This appeal followed.

Md. Code (1986, 1994 Repl. Vol., 1996 Supp.), § 8-209(h)(1)(ii) and § 13-305(c)(2) of the Tax Property Article ("T.P.") are central to this case.[2] On appeal, Rouse contends that the Supervisor, the Tax Court, and the circuit court erred by considering the three parcels as a single entity when analyzing the "more intensive use" issue under T.P. § 8-209(h)(1)(ii). Instead, Rouse maintains that each parcel should have been considered as a discrete entity, so that all three parcels would not have been disqualified for the agricultural

---

1. Pursuant to Md. Code (1986, 1994 Repl. Vol., 2000 Supp.), § 2-105 of the Tax-Property Article, each County and Baltimore City has a Supervisor of Assessments, who is an employee of the State Department of Assessments and Taxation. *See Abramson v. Montgomery County,* 328 Md. 721, 727, 616 A.2d 894 (1992).

2. We note that T.P. § 8-209 was amended in 1997. The amendment redesignated the provision in issue here, T.P. § 8-209(h)(1)(ii); that section is now codified in T.P. § 8-209(h)(1)(i). Because the amendment is applicable to all taxable years beginning after June 30, 1997, 1997 Md. Laws Chap., we shall refer to the earlier version of T.P. § 8-209. Similarly, although the current version of the Tax Property Article includes a 2000 Supplement, we must consider the version of the statute in effect at the relevant time.

use assessment. Then, only Parcel 1 would have been subject to the Ag Tax and penalty, pursuant to T.P. § 13-305.

On appeal, Rouse presents two questions for our consideration:

1. In light of this Court's holding that this case "presents a Euclidian zone (R-R, as it existed on June 30, 1972) as a base zone for comparison to a planned unit development (or floating zone), the M-X-C, *as embodied in Rouse's approved preliminary development plan* " ... did the Tax Court err as a matter of law in finding that M-X-C is a more intensive zoning category than [Rural Residential] without reference to the uses permitted by Rouse's approved preliminary development plan on each of the three properties involved in this case?

2. As a matter of fact, based on the evidence of record and the definition of intensity of use adopted by this Court in *Rouse I*, is the use permitted under the M-X-C zoning [of Parcels 2 and 3] less intensive than the use permitted on those same parcels under R-R zoning?

For the reasons that follow, we shall affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The dispute involves the same evidentiary record that we considered in *Rouse I*. By Order dated August 3, 2000, we permitted the parties to re-submit the same Joint Record Extract that they previously presented in connection with the first appeal, updated with a Supplementary Extract. In the same spirit, we shall incorporate here most of our factual summary from *Rouse I*, 120 Md.App. at 673–84, 708 A.2d 19, and supplement it with additional information pertinent to this appeal.

In January 1990, Rouse acquired three contiguous properties in Prince George's County from three different owners. The land is located just west of the City of Bowie, and consists of a total of 1,058 acres. Parcel 1 contains approximately 473 acres, Parcel 2 consists of approximately 339 acres, and Parcel 3 measures approximately 246 acres.

At the time Rouse acquired the subject properties, each was used as a sod farm and was benefitted by an agricultural use assessment under T.P. § 8-209. To maintain that favorable assessment, and to avoid imposition of the Ag Tax, appellant filed a declaration of intent for each parcel with the State Department of Assessments and Taxation ("SDAT"), pursuant to T.P. § 13-305(c)(1)(i), by which it agreed to maintain the agricultural use of each parcel for five consecutive tax years, *i.e.*, until July 1, 1995. Under T.P. § 13-305(c)(2)(i), if a transferee fails to comply with the declaration of intent, or if the property fails to qualify during the five-year period for the agricultural use tax assessment under T.P. § 8-209, then the Ag Tax, plus a 10% penalty, is due on the "portion" of the land that fails to satisfy the declaration of intent or qualify for agricultural use.

At the relevant time, the rezoning of land after July 1, 1972, to a more intensive use than was permitted on or before July 1, 1972, disqualified the land for an agricultural use assessment. T.P. § 8-209(h)(1)(ii) stated:

[T]he following land does not qualify to be assessed under this section:

\* \* \*

(ii) land rezoned after July 1, 1972, to a more intensive use than the use permitted on or before July 1, 1972, if a person with an ownership interest in the land has applied for or requested the rezoning . . . .[3]

It is undisputed that on July 1, 1972, the subject properties were zoned R R (Rural Residential).

In 1992, the Prince George's County Code was amended to include a Planned Unit Development ("PUD") zoning category, called Mixed Use Community ("M X C"), for large tracts of at least 750 acres. *See Prince George's County Zoning Ordi-*

---

3. Under the amended statutory provision, applicable after June 30, 1997, land does not qualify for an agricultural use assessment if it is "rezoned to a more intensive use than the use that immediately preceded the rezoning . . . ."

*nance* (1994) (the "Zoning Ordinance"), § 27-546.04(a). Appellant participated in developing the ordinance that created the classification.

On May 3, 1993, Rouse filed an Application for Zoning Map Amendment, seeking to rezone all 1,058 acres of the subject properties to M-X-C. As required, the Application was accompanied by a Preliminary Development Plan ("PDP"). According to Rouse, when the County approves the M-X-C zoning, it necessarily adopts the PDP. In this case, the PDP provided for a mix of uses on the land, including residential, commercial, recreational, and public. Eventually, a Final Development Plan ("FDP") must be filed and approved, which must be generally consistent with the PDP.

On May 9, 1994, the County enacted a Zoning Ordinance approving the M-X-C zoning for all 1,058 acres. The Zoning Ordinance of May 9, 1994, provides, in pertinent part:

> Total development of this 1,058 acre site shall be limited to 1,799 dwelling units, 100,000 square feet of retail space, and 250,000 square feet of office/service/institutional uses, and such other "community space" determined to be appropriate during subsequent phases of approval.

Rouse intends to develop the subject properties over a period of ten to fifteen years.

The rezoning of Rouse's land to M-X-C occurred less than five years after Rouse purchased the subject properties, and while the parcels were subject to the declarations of intent. The Supervisor concluded that the rezoning of the three parcels to M-X-C constituted a more intensive use than had been permitted under the R-R zoning that was in effect on July 1, 1972.[4] As a result, in December 1994, appellee issued three separate notices to appellant, advising that the May 1994 rezoning to M-X-C violated Rouse's declarations of intent.

_____

4. At the time of the rezoning, the subject properties were actually zoned R E (Rural Estate). For purposes of this appeal, however, the parties agree that the R E zoning is irrelevant. As we observed, under T.P. § 8-209(h)(1)(ii), the relevant zoning is R-R, because that was the zoning for the subject properties that was in effect on July 1, 1972.

Therefore, pursuant to T.P. § 13-305, the Supervisor levied an Ag Tax of $408,377.50 and penalties of $40,837.75. Appellant appealed to the Tax Court.

On January 17, 1996, the Tax Court held an evidentiary hearing, at which both parties presented expert witnesses. The experts testified about the permitted uses of the subject properties under the current M-X-C zoning and the R-R zoning. The experts also expressed their opinions about whether M-X-C zoning was a more intensive use than R-R zoning as of July 1, 1972.

Under R-R zoning in 1972, the minimum lot size was 20,000 square feet for single family detached residential development. "Cluster" developments,[5] with reduced lot sizes and the flexibility to introduce single family attached dwellings (townhouses) into the total dwelling yield of a development proposal (but at no greater number of total units than could be obtained under the maximum allowed non-cluster density of 2.0 units per acre), were also permitted. But the difference between the reduced lot size (10,000 square feet for detached dwellings and 1,500 square feet for townhouses) and the conventional lot size (20,000 square feet) was to be set aside as open space elsewhere in the parcel. Nonresidential uses, permitted as of right, included, *inter alia:* churches, libraries, museums, public buildings, public parks, and animal hospitals. Uses permitted by special exception included, *inter alia:* airports, antique shops, cemeteries, commercial recreational attractions, golf courses, hospitals, motels, horse racing tracks, sanitary landfills, sawmills, and tourist homes. Principal uses not enumerated as permitted uses or as special exception uses were expressly not allowed in the R-R zone.

M-X-C zoning allow a mix of uses on the land. In order to obtain M-X-C zoning, the preliminary development plan accompanying the rezoning application must demonstrate that the PDP complies with the following criteria: (1) at least 30%

---

**5.** Cluster developments are a discretionary alternative development scheme available only through the subdivision process.

of the gross area must be devoted to community use areas; (2) at least 10% of the gross area must be devoted to single family, low density dwellings; (3) at least 20% of the gross area must be devoted to single family, medium density residential units; (4) no more than 15% of the gross area may be devoted to "other residential" units; and (5) nonresidential areas must comprise between 5% and 20% of the gross area of the zone. These general parameters of the development are refined in the subsequent phases of the approval process, in which the developer must submit a Comprehensive Sketch Plan ("CSP") and a Final Development Plan. Both the CSP and FDP must be consistent with the PDP.

Permitted residential uses in the M-X-C zone include: single family detached houses; townhouses; duplex houses; and apartments. As a matter of right, various nonresidential uses are also permitted under M-X-C zoning, but not under R-R zoning. These include: banks; data processing facilities; eating or drinking establishments; research and development and testing laborator[ies]; blueprinting, book, camera, gift, jewelry, music, souvenir, or other specialty stores; department store; dry cleaning; drugstore; food and beverage store; gas station; hardware store; pet shop; photographic supply store; seafood market; repair shops; variety and dry good stores; and an arena.

Appellant's land use planning expert, Thomas Kieffer, the head of the planning and zoning department of Ben Dyer Associates, opined that "the development permitted under the M X C at [the subject properties] is less intense than that permitted under the R-R." He compared the properties under the two zones, using some of the criteria developed in the 1960s by the Federal Housing Administration ("FHA") [6] and

---

**6.** The factors used by the FHA in determining Land Use Intensity ("LUI") are found in Byron R. Hanke, *Planned Unit Development and Land Use Intensity*, 114 U. Pa. L. Rev. 15 (1965). Hanke, who was then the Chief Land Planner for the FHA, described the intensity factors as follows, at 114 U. Pa. L. Rev. at 22:

LUI expresses a group of six physical relationships in a developed property. First, it expresses the overall relationship of the amount of

some of his own. Kieffer admitted that he could not perform an analysis using all of the FHA factors, however, because the factors were designed to analyze completed projects rather than planned projects. He considered the following factors: (1) density, expressed in terms of dwelling units per acre ("du/ac") for residential development, and floor area ratio ("FAR") for nonresidential development; (2) average household size; (3) student yield; (4) sewage disposal requirements; (5) parking requirements; and (6) traffic congestion. Kieffer concluded that, in every category except two (parking requirements and traffic generation during p.m. peak hour trips), the R-R zoning category was more intensive than M-X-C zoning.

Regarding the nonresidential uses, Kieffer compared a hospital, which was a permitted use as a matter of right in R-R zoning in 1972, to the mix of office, service, and institutional type uses permitted under M-X-C zoning. For comparison purposes, Kieffer used the Greater Laurel Beltsville Hospital, which had been built in an R-R zone, on a 48 acre parcel. After considering the intensity factors, Kieffer concluded that the hospital under R-R zoning would be more intensive than the commercial type uses permitted under M-X-C zoning.

Kieffer's comparison of residential development under R-R zoning and M-X-C zoning focused largely on the differences in density. Specifically, he determined that, based on a housing mix of 75% single family detached dwellings and 25% single family attached dwellings, the R-R zoning had a net density of 1.849 dwelling units per acre. On the other hand, under M-X-C zoning, pursuant to the PDP approved as part of the M-X-C

---

building mass (total floor area) to the amount of land area. Second, it relates total open space of a property to its total floor area. In other words it contrasts the exterior open space with the interior residential space, thereby relating the individual to his environment. Third, in considering exterior open space, LUI distinguishes between space that is for people, called livability space, and the space that is used for cars. Fourth, it considers large recreation space as well as other outside livability space. The final two ratios relate the number of car storage spaces to the number of living units. One considers only long term parking spaces for occupants, while the other considers all spaces including short time spaces for guests.

rezoning for the subject properties, based on a housing mix of 37% single family detached dwellings, 58% single family attached dwellings, and 5% multi-family housing, the net density would be 1.79 du/ac. In his analysis of the M-X-C zoning, Kieffer deducted approximately 60 acres to account for a proposed road interchange that exists on the current master plan. Kieffer did not subtract this 60 acres when he analyzed the subject properties under R-R zoning, however, because the interchange did not exist on the 1972 master plan. Instead, Kieffer subtracted 21 acres under his R-R zoning analysis to account for an "outer beltway" that had been shown on the 1972 master plan.[7]

In viewing the subject properties collectively, Keiffer concluded that M-X-C zoning was less intensive than R-R zoning. In addition, Kieffer analyzed each of the subject properties individually. For Parcel 1, he concluded that the residential uses under M-X-C were more intensive than under R-R, but that the nonresidential uses on that parcel were less intensive than under R-R. With respect to Parcel 1, he opined that M-X-C zoning was not more intense than R-R zoning. He explained: "[I]t's too close to call. I can't say for sure that the overall effect is that parcel one would be more intense under the M-X-C zone." For Parcels 2 and 3, however, which are solely targeted for residential development, Kieffer concluded that M-X-C zoning was less intensive than R-R zoning.

Thomas Lockard, a land use planner with the Prince George's County Planning Department of the Maryland National Capital Park & Planning Commission, testified as an

---

7. The parties dispute whether the difference—39 acres—should have been deducted under the R-R analysis. Kieffer acknowledged that, if he had deducted 60 acres under R-R zoning, instead of 21 acres, there would be 1,773 total residential units under R-R zoning, compared to 1,799 residential units under M-X-C zoning. Appellant argues that, because T.P. § 8-209 only requires comparison with the "use permitted on or before July 1, 1972," the interchange should not be considered, because it was not on the 1972 master plan. We need not resolve this issue, however, because, as we shall explain, density is not the sole criterion in determining whether the rezoning results in a more intensive use of the land.

expert for appellee. He said that, as of July 1, 1972, the only dwelling types permitted under R-R zoning were single family detached homes and, in a cluster development, single two-family attached homes.[8] Lockard noted that, unlike in the M-X-C category, no apartments were permitted in an R-R property. Lockard also stated that, under M-X-C zoning, the permitted dwellings include single family detached houses, townhouses, duplexes, triplexes, and apartment buildings. Regarding nonresidential uses, Lockard listed the commercial establishments permitted as a matter of right under M-X-C, but not under R-R zoning. He also observed that a hospital would be "probably the most intensive use that would have been permitted in the R-R zone." Lockard offered his opinion that, "based ... on the types of uses generally permitted under the R-R zone versus the types, quantities, and amounts of uses permitted under the M-X-C zone," the M-X-C zone, under Rouse's approved PDP, is more intensive than was the R-R zone in 1972.

The following testimony during Lockard's cross-examination is noteworthy:

[APPELLANT'S COUNSEL]: You did a comparison here, right? You did a comparison between the M-X-C zone and the R-R zone, is that correct?

[LOCKARD]: That's correct.

[APPELLANT'S COUNSEL]: When you used, as your comparison, the R-R zone, did you look at the PDP which was approved?

[LOCKARD]: I did.

[APPELLANT'S COUNSEL]: And was that the basis of your analysis?

[LOCKARD]: It was, as well as the types of uses that are permitted in that zone by ordinance.

---

8. On October 17, 1972, the County Council of Prince George's County amended the zoning ordinance to prohibit attached dwellings from cluster development in an R-R zone. That amendment is not applicable to this case, however, because T.P. § 8-209 requires a comparison of zoning in effect on July 1, 1972.

[APPELLANT'S COUNSEL]: So you looked at the types of uses that could have been applied to this M-X-C zone?

[LOCKARD]: And still can be developed on this property.

[APPELLANT'S COUNSEL]: *Will you agree with me that the permitted uses on this property will be those uses that are described on the final development plan filed in the land records?*

[LOCKARD]: *That's correct.*

[APPELLANT'S COUNSEL]: *And that the final development plan must be consistent with the uses set forth on the PDP?*

[LOCKARD]: *That is correct.*

[APPELLANT'S COUNSEL]: *So you agree* that as far as permitted uses and bulk regulations and other zoning requirements, *we look to the FDP as ultimately approved consistent with the PDP, is that correct?*

[LOCKARD]: *That is—that is correct to a point. Up to this point not all of the uses on this property have been tied down with any specificity. They have been generally identified as to what they will be.* But not—but *there are many uses which could fall under the office, service, institutional use for which we have two hundred and fifty thousand square feet approved.*

\* \* \*

[APPELLANT'S COUNSEL]: Looking at the permitted uses approved in the PDP, and the FDP will be consistent with the PDP, is that correct?

[LOCKARD]: It would have to be.

[APPELLANT'S COUNSEL]: Right. Looking at the permitted uses in the PDP, there's a limitation of one thousand seven hundred and ninety-nine dwelling units, is that correct?

[LOCKARD]: That's correct.

[APPELLANT'S COUNSEL]: So when someone suggests that well you could have more dwelling units because you

could get two per gross acre, that's really not relevant to the intensity of use that will be permitted under this M-X-C zone, isn't that correct?

[LOCKARD]: That is correct. They are—the applicant is capped at one thousand seven hundred and ninety-nine dwelling units and cannot exceed that, no.

(Emphasis added).

In its analysis, the Tax Court focused on the meaning of the phrase "more intensive use" in T.P. § 8-209, which is not defined in the statute. The Tax Court also acknowledged § 27-109(b) of the Zoning Ordinance, which lists the various zoning classifications from least to most intensive. It states:

[T]he order of intensity of zones is listed as follows, beginning with the least intense zone and progressing to the most intense:

(1) R-O-S, O-S, R-A, R-E, V-L, R-L, V-M, **R-R**, R-S, R-80, R-55, R-M-H, R-35, R-20, R-M, R-T, R-30, R-30C, R-18, R-18C, R-U, R-10A, R-10, R-H, C-A, C-O, **M-X-C**, M-U-TC . . . .

(Boldface added). The Tax Court noted, however, that although M-X-C is listed as being more intensive than R-R, the testimony demonstrated that the listing was "a pretty arbitrary thing" and that it was done for other purposes.

In its oral opinion, the Tax Court said, in part:

[A]s far as I am concerned, [the Legislature was] looking at it from the standpoint that the property owner was taking an action to make something more valuable, and to be able to do something with a piece of property that they could not do before.

. . . [S]eldom have I ever seen somebody requesting a rezoning of property if it wasn't going to end up being a financial benefit to them. This is generally what happens.

Now, in this particular situation, what has been ably presented to this Court, and done in a very detailed fashion, is that when I define intensive, I should do it and limit my definition of it to whether or not there are, for instance,

more units that are created by this rezoning. And it's represented that it's actually less.

In other words, it's been shown here by various exhibits and testimony that by proceeding in the manner that [appellant] is allowed to do under the M-X-C zoning, that we actually end up with less units than we do under the R-R; that when we take all of the other factors that deal with intensities, that for the most part not all of them, but most of them come up less than R R.

Unfortunately for [appellant], I do not feel that that alone is the criteria that has to be factored in in making a decision as to what is meant by the word intensive as used in 8 209. And I say that for this reason—it is undisputed that [appellant] is going to be able to do, as a matter of right, not as a matter of special exception, but as a matter of right more things than could be done under the R-R zone.

For instance there's a whole laundry list of commercial type activities that a property owner with this type of zoning is entitled to do under this type zoning that they couldn't do under R-R. There is a difference in the type of residential units that they can have in this zoning that they couldn't have under R-R.

Again, I'm not losing sight of the fact about the densities and how they have to remain. But still for instance we know this, that under R-R you couldn't have an apartment house. Under this particular zoning that you can have an apartment house.

*The bottom line is this—is that there is much more leeway exists [sic] as far as the zoning code goes to the property owner with this type zoning than with the leeway that the property owner had under an R-R zoning. And as far as I am concerned, that becomes a factor of making something more intensive.*

\* \* \* \*

And the reason there's not going to be a great number of [properties with this type of zoning] is that number one, you

have to have a minimum of seven hundred and fifty acres to even begin to quali[f]y for this.... There are parameters that are built into this and guidelines that have to be followed, but for all intents and purposes this property owner gets to structure this in such a manner that they can go ahead and do pretty much everything they want to do under—as far as developing this piece of property goes.

In other words, we even had testimony here today that it may be ten to fifteen years before all of the things that are going to be done with this property are eventually done. And again I cannot ignore the fact, nor do I criticize it in any way, shape or form, that it appears that the property owner in this case, or [appellant] in this case, is really the one that nudged the county to turn around and create a zoning category such as this.

\* \* \* \*

... I would be like an ostrich sticking its head in the sand if I didn't think that the Rouse-Fairwood Development Limited Partnership was moving forward to develop this land in a manner that is going to be financially to their best interest.

And again, there is nothing wrong with that.

\* \* \* \*

But the decision that I have to make today is whether or not I feel that under this section of the Code, that when this became M-X-C if it went to a more intensive use. And it is not easy. It is not an easy decision to make.

But I am making the decision that it is subject to the tax, and that it was a more intensive use. And here is one of the real reasons that I do, and bearing in mind all of the testimony that I've heard, and all the evidence that's been received here today.

And I'm quoting, you know, from an annotation that's under this section. And it says this section must be strictly construed. The preferential treatment accorded by this sec-

tion is essentially an exemption, and as such the section must be strictly construed....

And then the preferential treatment accorded by this section is essentially an exemption and as such must be strictly construed in favor of the taxing authority. If any real doubt exists as to the propriety of an exemption, that doubt must be resolved in favor of the State.

And that is exactly where I find myself in connection with this particular situation. I have sat here and I have listened very carefully. I have turned it over in my mind many different ways....

\* \* \* \*

... I have sat here, and as difficult as it is, when I apply the law as I just read it from a couple of different Maryland cases, to doubt an exemption is to deny an exemption. And that's where I am here. I doubt it, and I have to deny it. So the Court will sign an order affirming the assessment that was made against this property by the Supervisor....

Accordingly, on February 21, 1996, the Tax Court issued an order affirming appellee's decision. Thereafter, appellant sought review in the circuit court. In an oral opinion issued March 28, 1997, the circuit court affirmed. The judge stated:

I agree with the taxing authority. I see intensive—I picture this bucolic country side with horses and chickens and pigs and so forth. And we start there and we move toward the city. We start having our suburbs with sprawling ... homes and so forth.

So, each time as we move in towards the big city, we are getting more and more intense use and I think that's what the tax judge found in this case, that in fact when we went from rural residential to this mixed use of this land in allowing light industry and so forth, it was a more intense use than when it was under rural residential.

I don't believe [the Tax Court] made [its] decision just on the fact that the value of land went up....

I believe he was correct not just by the standard of review. I believe he was correct. . . .

Appellant subsequently appealed to this Court. In *Rouse I,* we essentially considered two issues: (1) whether the Tax Court erroneously interpreted the phrase "more intensive use" in T.P. § 8-209(h)(1)(ii); and (2) whether the Tax Court erred by failing to consider Rouse's alternative position that the three declarations of intent, filed pursuant to T.P. § 13-305(c)(1), evidenced that the three parcels are distinct and require separate analysis in regard to the agricultural use assessment and Ag Tax.

A central issue in *Rouse I* concerned the meaning of the undefined statutory term, "more intensive use," contained, at the relevant time, in T.P. § 8-209(h)(1)(ii). *Rouse I,* 120 Md. App. at 686, 689, 708 A.2d 19. In construing that term, the Tax Court considered significant the minimum lot size of 750 acres needed to qualify for M-X-C zoning, the "leeway" afforded by such zoning, and the wide variety of commercial and residential uses permitted by M-X-C zoning and the PDP. We were satisfied that the Tax Court correctly construed the phrase. In our view, the rezoning authorized the "potential change in character, along the continuum toward an urban or industrial environment. . . ." *Id.* at 691, 708 A.2d 19. If the land was considered as a whole, we agreed with appellee that the subject properties were rezoned to a "more intensive use."

As an alternative position, however, Rouse claimed that the three parcels were discrete units, and thus should have been evaluated separately to determine whether each declaration of intent was breached. That argument was largely grounded in T.P. § 13-305(c)(2)(i), which provides, in part: "If there is a failure to comply with a declaration of intent filed [under T.P. § 13-305] . . . or there is a failure to qualify for the farm or agricultural use assessment under [T.P.] § 8-209 . . . during the time that a declaration of intent is in effect, the agricultural land transfer tax, plus penalty, is due [only] *on that portion of the land* that fails to comply with the declaration of intent or to qualify for farm or agricultural use." (Emphasis added).

Rouse observed that, under the PDP, 53 acres of Parcel 1 were designated for nonresidential development, but Parcels 2 and 3 were "targeted only for residential development and open space under the PDP. . . ." *Rouse I,* 120 Md. App. at 695, 708 A.2d 19. Accordingly, Rouse claimed that, at worst, only Parcel 1 failed to comply with the declaration of intent, but Parcels 2 and 3 of the subject properties were "still entitled to the agricultural tax assessment." *Id.*

In response, appellee argued that the three parcels did not merit separate consideration as to intensity of use, because all three were combined to create a single property eligible for M X C zoning. Moreover, none of the parcels was large enough, by itself, to qualify for M-X-C zoning, which requires a minimum of 750 acres. Further, appellee contended that the rezoning was achieved through one zoning application, and approved by one ordinance, pursuant to a single PDP.

We recognized in *Rouse I* that none of the three parcels would have been large enough, by itself, to qualify for M-X-C zoning. But, we also acknowledged that, based on the plain language of T.P. § 13-305, it was arguable that the Ag Tax and penalty were due only on the "portion" of the land, or the particular parcel, that did not comply with the declaration of intent. *Id.* at 697, 708 A.2d 19. Because the Tax Court did not indicate whether its finding of more intensive use was predicated upon all three parcels considered collectively or separately, and because it did not specifically address Rouse's alternative argument that it was entitled to a separate intensity analysis for each parcel, we remanded to the Tax Court to explain whether and why the Ag Tax was due for all three parcels, rather than just the offending "portions" of the land. *Rouse I,* 120 Md.App. at 697–98, 708 A.2d 19; *see United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994) (recognizing that an agency's decision may be affirmed only upon the agency's findings of fact and for the reasons stated by the agency.)

Following our remand, the Tax Court heard oral argument on August 25, 1999. In an oral opinion, the Tax Court noted

that the entire tract had been rezoned to M-X-C, a zoning classification that allowed for "more intensive use" than the prior R-R zoning, and concluded that all three parcels were disqualified from the agricultural use assessment and subject to the Ag Tax and penalty. The Tax Court reasoned, in relevant part:

> [A]lthough I may not have said it in crystal clear words, *I was considering all three parcels as one unit*.... In other words, if it were [a] circumstance where I had concluded factually, after hearing all the facts, and in accordance with the applicable statutes, that the tax should not have applied to one or more of the parcels described, I certainly would have said that in relation to the opinion that I dictated.

> \* \* \*

> Now for a minute let me back up and I'll not intend to reiterate or even try to reiterate what I've said in the oral opinion from the bench back [in] ... 1996. But part of the things that I've said in that opinion was that the MXC zoning allowed a more intensive use than the RR, which stands for rural residential zoning, that existed on the property prior to it being changed to MXC. When that—when this case was originally before this Court, the Petitioner was disputing the implementation of the agricultural transfer tax penalty or assessment or whatever we want to call it, that is, the money that is ... called for to be paid under 13-305. They were disputing that it even applied to one. For instance, they were, in effect, saying that the ... MXC is not [a] more intensive use and that none of this property should be subjected to the tax.

> I know and we cleared it up this morning before we began this hearing that the Petitioner has changed her opinion as to Parcel 1 and apparently now concedes that [it] is subject to the tax, but they maintain that for the reasons they cite and are supposedly supported by the opinion of the Court of Special Appeals, that this Court should make a different finding as to Parcels 2 and 3 for the reasons stated.

Well, again, let me read from the opinion of the Court of Special Appeals ... "Had MXC zoning existed in 1972, we do not believe that Rouse could have maintained the agricultural use assessment and it would be illogical to interpret the statute to permit such uses to day."

\* \* \*

[T]his Court does not change its mind from the fact that Parcels Number 2 and 3 are, in fact, subject to the agricultural transfer tax. Just as I held and found back in 1996.

Now I say that for different reasons. One of them is that I think it is only sensible and I think common sense to a degree dictates that when one reads ... Tax Property Section 8-209 regarding the situations that can eliminate the agricultural assessment on properties, it specifically states, "Land rezoned after July 1, 1972 to a more intensive use than the use permitted on or before July 1, 1972...." *Number one, there is no dispute in this case that the present owner of the land is the one that requested the rezoning.* As a matter of fact, as was recognized in the opinion of this Court back originally ... [Rouse] apparently worked with the County to even create this type of zoning so they could do what they wanted to do in connection with this development. And so there isn't a question but that all the facts are such that this property falls squarely into this paragraph. *The only question being about the intensive use.* And I'm going to say this that as far as I am concerned *for all the reasons that I stated in my original oral opinion, I think that the MXC zoning is more intensive than RR....*

*The way I read Section 8-209[,] if the rezoning is concluded to be of a more intensive use, then I think that triggers the agriculture transfer tax.* If I followed the logic and the argument being made by the taxpayer in this case ... it seems to me ... that the Maryland Legislature is going to have to change the law.

\* \* \*

Please note that when one reads [T.P. § 13-305], that statute never uses the language more intensive use. That

section of the statute doesn't say a more intensive use. What that section of the statute says that if there is a portion that fails to comply. To me, the two sections are no way tied together in the fashion that is indicated by Petitioner or even [the] Court of Special Appeals. I don't think that we turn around and look at 8-209 and find the word "intensive use" in there and then somehow or another, carry that over into 13[-]305 when we are dealing with a portion of land that fails to comply. *I think ... Section 8-209 and 13[-]305 really function independent of each other.* . . .

\* \* \*

*I found that the MXC zone for whatever reasons was more intensive than the RR zone. All three of these parcels were rezoned to a MXC zone.* I am not unaware of the fact of the arguments made by Petitioner's counsel that there is a preliminary development plans [sic], and that it'll take fifteen or twenty years for instance, before all this property is developed and I have taken all those things into consideration and yet, my opinion stays in the manner that I have outlined here today.

\* \* \*

The only thing is the Court of Special Appeals is, in effect, saying, you know, did it apply—*were you considering all three parcels when you made that decision and as I stated earlier, I have answered that as yes, I was.* And I, as far as additional reasons to be given for why 2 and 3 should be treated as the same way as 1 and as all one unit, I have done the best job I can in telling you all that.

(Emphasis added).

On November 4, 1999, the Tax Court issued an order in which it ruled that the property "shall be considered as one unit, and not three parcels", for purposes of T.P. § 8-209. Therefore, it affirmed the removal of the agricultural use assessment from the "entire subject property," and upheld the imposition of the Ag Tax and penalty under T.P. § 13-305.

Thereafter, Rouse sought judicial review in the circuit court, which affirmed in an oral opinion issued on May 12, 2000. The circuit court stated, in relevant part:

> I find that the determination by Judge Calvert as to the non-linking for purposes of his decision making process of 8-209 of the Tax Property Article and 13-305 of the Tax Property Article is accurate. I find that his decision that the zoning having been changed from RR to MXC on all of the property does not then require that each specific use within those properties be examined to determine whether there is a more intensive use here, there or anywhere. And that the loss of the classification under 8-209 as agricultural or farm property requires then that 13-305 kick in, and that the tax court and I do not have to examine each specific use within each specific piece of property. And for those reasons I will affirm the decision of the tax court.

This appeal followed. We shall include additional facts in our discussion.

## DISCUSSION

### I.

Preliminarily, it is important to set forth the statutory provisions in issue, and to review the statutory scheme. In general, the Ag Tax promotes the preservation of farms and agricultural land, because it "inhibits property owners from transferring agricultural land to nonagricultural uses...." *DMH Joint Venture v. Hahner,* 80 Md.App. 257, 266, 562 A.2d 772, *cert. denied,* 318 Md. 96, 566 A.2d 1112 (1989). According to the SDAT's literature, the Ag Tax "serves a dual role—first as a deterrent to conversion of the land and second as a penalty when the land is sold for development." *See* State Department of Assessments and Taxation, Real Property, *The Agricultural Transfer Tax,* at http://www.dat.state.md.us/sdatweb/agtransf.html (2/15/00) (hereinafter, *"Agtransf."*).

T.P. § 8-209 evidences the Legislature's intent to preserve and protect agricultural land. It provides, in part:

(a) *Public interest.—The General Assembly declares that it is in the general public interest of the State to foster and encourage farming activities to:*

(1) maintain a readily available source of food and dairy products close to the metropolitan areas of the State;

(2) *encourage the preservation of open space as an amenity necessary for human welfare and happiness; and*

(3) *prevent the forced conversion of open space land to more intensive uses because of the economic pressures caused by the assessment of the land at rates or levels incompatible with its practical use for farming.*

(b) *Legislative intent.*—It is the intention of the General Assembly that the assessment of farmland:

(1) be maintained at levels compatible with the continued use of the land for farming; and

(2) not be affected adversely by neighboring land uses of a more intensive nature.

(c) *How valued.*—Land that is actively used for farm or agricultural use shall be valued on the basis of that use and may not be valued as if subdivided.

(d) *How assessed*—Land that is valued under subsection (c) of this section shall be assessed on the basis of 50% of its use value.

(e) *Criteria for assessing—*

(1) The Department shall establish in regulations criteria to determine if land that appears to be *actively used for farm or agricultural purposes:*

(i) is actually used for farm or agricultural purposes; and

(ii) qualifies for assessment under this section.

(2) *The criteria shall include:*

(i) *the zoning of the land;*

(ii) the present and past use of the land . . .;

(iii) the productivity of the land, including timberland and reforested lands;

(iv) the gross income that is derived from the agricultural activity.

(Emphasis added).

The text of T.P. § 8-209(a) and (b) reveals that, as a matter of public policy, the General Assembly considers the preservation of agricultural land of great importance to the interests of the State.[9] To further that purpose, T.P. § 8-209 creates a favorable tax assessment for qualifying property. Such property is entitled to the benefit of an agricultural use assessment, which provides for a property tax assessment based on agricultural or farm use, rather than actual market value. As a result, the owner of such land generally benefits from reduced property taxes, creating "less pressure to convert the land to more intensive uses." *Agtransf.* In this way, the agricultural use assessment "serves to remove some of the developmental pressure on the land by holding down the property tax burden." State Department of Assessments and Taxation, Real Property, *The Agricultural Use Assessment*, at http://www.dat.state.md.us/sdatweb/aguse.html (10/23/00) (hereinafter, *"Aguse "*).

Ordinarily, the Ag Tax is imposed on the instrument that conveys title to the property, and must be paid in order to record the deed. *Agtransf.* But, T.P. § 13-305(c)(1)(i) creates an exemption to the Ag Tax; the Ag Tax is waived if the purchaser agrees to maintain the agricultural use for five consecutive years, pursuant to a declaration of intent filed with SDAT. *Agtransf.* Property is disqualified for the favor-

---

**9.** To be sure, the General Assembly also recognizes the importance of planned developments. Md. Code (1998 Repl. Vol.), Art. 66B, § 10.01(a) states, in part: "In order to encourage the preservation of natural resources or the provision of affordable housing and to facilitate orderly development and growth," the General Assembly encourages the enactment of local ordinances providing for, *inter alia,* "Planned unit developments." Art. 66B, § 10.01(a)(b). Similarly, T.P. § 8-220(a) provides: "The General Assembly states that it is in the public interest to provide for the development of lands in a planned manner." To that end, special taxing provisions have been enacted by the General Assembly. *See, e.g.,* T.P. §§ 8-222—8-228. The parties have not suggested that any of the above mentioned statutory provisions have any relevance to this case.

able agricultural use assessment, however, if the owner takes certain actions that result in a more intensive use of the land. In this regard, T.P. § 8-209(h) states:

(h) *Exclusions.*—(1) Subject to paragraph (2) of this subsection, the following land does not qualify to be assessed under this section:

\* \* \*

(ii) land rezoned after July 1, 1972, to a more intensive use than the use permitted on or before July 1, 1972, if a person with an ownership interest in the land has applied for or requested the rezoning;

According to SDAT's literature, its "sole focus is on the nature and the extent of the use of the land." *Aguse.* SDAT seeks to determine whether land for which the agricultural use assessment is claimed is "actively used" for agricultural purposes. *Aguse; see* T.P. § 8-209(e). SDAT's literature also provides that "[a]nother important restriction" on entitlement to the agricultural use assessment relates to the zoning of land "to a more intensive use. . . ." *Aguse.* According to SDAT, when "the owner requests . . . rezoning, the use assessment must be removed." *Aguse.*

The Code of Maryland Regulations ("COMAR") is also relevant. COMAR defines "actively used land" as "land that is actually and primarily used for a continuing farm or agricultural use." Additionally, COMAR 18.02.03.01B(1). COMAR identifies eleven criteria that SDAT "shall" consider "in determining whether land that appears to be actively used is in fact actively used and qualifies for [the] agricultural use assessment under [T.P.] § 8-209. . . ." COMAR 18.02.03.02. The criteria include:

A. Zoning applicable to the land, in particular if land is zoned to a more intensive use than is permitted under agricultural zoning;

B. Present and past use of the land;

* * *

D. Extent of production for sale. . . .

E. Size of the parcel or parcels farmed. . . .

* * *

K. The gross income that is derived from the agricultural activity on the land.

COMAR also lists "nonexclusive examples of violations of a declaration of intent," which will result in imposition of the Ag Tax and penalty. COMAR 18.05.01.05. These violations include "[d]iscontinuing or failing to maintain an agricultural activity on the land." COMAR 18.05.01.05A. Of significance here, COMAR 18.05.01.05F provides that a violation occurs for "[r]ezoning the land under Tax-Property Article, § 8-209(h)(1)(ii). . . ."

T.P. § 13-305 is also important here. It provides, in part:

**§ 13-305. Exemptions from tax.**

* * *

(c) *Instruments not subject to tax; requirements; failure to comply.*—(1) Except as provided in paragraph (2) of this subsection, an instrument of writing that transfers title to agricultural land that is eligible for farm or agricultural use assessment under § 8-209 of this article is not subject to the agricultural land transfer tax if the transferee:

(i) files with the supervisor before the transfer a declaration of intent to farm the agricultural land that specifies that all of the transferred agricultural land will remain in farm or agricultural use for at least 5 full consecutive taxable years; and

(ii) applies for farm or agricultural use assessment under § 8-209 of this article for the land that is transferred.

(2)(i) *If there is a failure to comply with a declaration of intent filed under paragraph (1)* of this subsection including the building of nonagricultural improvements or nonagricultural site improvements or there is a failure to qualify for

the farm or agricultural use assessment under § 8-209 of this article during the time that a declaration of intent is in effect, *the agricultural land transfer tax, plus penalty, is due on that portion of the land that fails to comply with the declaration of intent or to qualify for farm or agricultural use.*

(ii) The tax and penalty due under this subsection are a lien on the agricultural land that was transferred.

(Emphasis added).

The Maryland Tax Court, whose decision we now review, is an administrative agency. *See* Md. Code (1988, 1997 Repl. Vol.), § 3-102 of the Tax-General Article ("T.G."); *Supervisor of Assessments of Baltimore County v. Keeler,* 362 Md. 198, 207, 764 A.2d 821 (2001); *State Dep't of Assessment and Taxation v. North Baltimore Ctr., Inc.,* 361 Md. 612, 616 n. 5, 762 A.2d 564 (2000); *Read v. Supervisor of Assessments of Anne Arundel County,* 354 Md. 383, 391, 731 A.2d 868 (1999); *Prince George's County v. Brown,* 334 Md. 650, 658 n. 1, 640 A.2d 1142 (1994). Accordingly, pursuant to T.G. § 13-532(a), the final order of the Tax Court is subject to judicial review, as provided in Md. Code (1984, 1999 Repl. Vol.), §§ 10-222 and 10-223 of the State Government Article, which pertains to the review of decisions of administrative agencies. *North Baltimore Ctr., Inc.,* 361 Md. at 616 n. 5, 762 A.2d 564.

The principles that govern judicial review of an administrative agency's decision, as well as statutory construction, are well established. Although the principles are important to this case, we discussed them at length in *Rouse I,* 120 Md.App. at 684–89, 708 A.2d 19. Therefore, we shall only briefly restate them here.

▮▮▮▮ Appellate review of a decision of the Tax Court is limited. *CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324 (1990); *Brown v. Comptroller of the Treasury,* 130 Md.App. 526, 531, 747 A.2d 232 (2000). Tax Court decisions are considered *prima facie* correct, and are reviewed "in the light most favorable to that court." *Maisel v. Montgomery County,* 94 Md.App. 31, 34, 614 A.2d 1333 (1992).

On review, we must affirm a decision of the Tax Court "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record." *State Dep't of Assessments and Taxation v. North Baltimore Center, Inc.,* 129 Md.App. 588, 595, 743 A.2d 759, *aff'd.,* 361 Md. 612, 762 A.2d 564 (2000).

Although our review of an administrative agency's decision is narrow, *Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 67, 729 A.2d 376 (1999), and we may not substitute our judgment for that of the agency as to factual findings supported by substantial evidence, *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985), we do not defer to the agency's legal conclusions. Instead, we review *de novo* an agency's legal conclusions. *State Dep't of Assessments & Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 72, 626 A.2d 360 (1993); *Maryland State Dep't of Educ. v. Shoop,* 119 Md.App. 181, 197, 704 A.2d 499, *cert. denied,* 349 Md. 495, 709 A.2d 140 (1998). This means that the substituted judgment standard applies to the Tax Court's legal analysis, including its interpretation of statutory provisions. *See North Baltimore Center, Inc.,* 129 Md.App. at 596, 743 A.2d 759.

To be sure, the seminal principle of statutory construction is to determine and effectuate the legislative intent. *Board of License Comm'rs v. Toye,* 354 Md. 116, 122, 729 A.2d 407 (1999); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995). Ordinarily, we are guided in this endeavor by the statutory text. *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999); *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996). Generally, we begin with the words of the statute, and give them their ordinary meaning. *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997); *Maryland-Nat'l Capital Park & Planning Comm'n. v. State Dep't of Assessments & Taxation,* 110 Md.App. 677, 689, 678 A.2d 602 (1996), *aff'd.,* 348 Md. 2, 702 A.2d 690 (1997). If a term or provision is ambiguous, however, we consider the language "in light of the . . . objec-

tives and purpose of the enactment," *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986), in order to ascertain the legislative intent. In this regard, "[w]e may . . . consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987).

 The interpretation of a statute is a judicial function, *Muhl v. Magan,* 313 Md. 462, 545 A.2d 1321 (1988); *Stavely v. State Farm Mutual Automobile Insurance Co.,* 138 Md. App. 1, 9, 769 A.2d 1008 (2001). Nevertheless, we "ordinarily give some weight to the construction given the statute by the agency responsible for administering it." *Magan v. Medical Mut. Liab. Ins. Soc'y. of Md.,* 331 Md. 535, 546, 629 A.2d 626 (1993); *see Mayberry v. Board of Educ. of Anne Arundel County,* 131 Md.App. 686, 700, 750 A.2d 677 (2000). In our effort to effectuate the Legislature's intent, however, we also may consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.,* 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted).

## II.

Rouse vigorously urges that the various courts involved throughout this litigation have repeatedly labored under a serious misapprehension regarding the important differences between traditional Euclidean zoning [10] and the more contemporary form of zoning at issue here, known as a Planned Unit Development or PUD. Rouse contends that the lower courts have continued to misunderstand PUD zoning and "the nature of the M-X-C zone as a PUD zone." In its view, the courts below erred by summarily concluding that because M-X-C is

---

**10.** *See Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

generally a more intensive zoning classification than R-R, and because all three parcels were rezoned to M-X-C, each parcel was necessarily disqualified for the agricultural use assessment. Appellant complains that the Tax Court failed to consider that the use under the earlier R-R zoning was actually more intense for parcels 2 and 3 when compared to the actual use permitted for those two parcels by the PDP. Rouse asserts:

> The simplistic answer of both the Tax Court and the Circuit Court was that the Tax Court had found M-X-C to be a more intensive zoning classification than R-R and, since each parcel had been rezoned to M-X-C, each must have been disqualified under § 8-209. *That reasoning would have merit if the new zoning had been to a traditional Euclidean zoning classification, but it demonstrably lacks merit in this case and illustrates the lower courts' misunderstanding of the concept of PUD zoning.*

(Boldface added by Rouse).

The linchpin of Rouse's position is its mantra "that the zoning on the subject properties is that set forth in the legislatively adopted PDP, not the M-X-C text in the general zoning ordinance, which only contains general parameters that might be adopted in an M-X-C zone." Moreover, Rouse maintains that *"the legislatively approved PDP in a PUD zone constitutes the required basis for the intensity comparison."* In other words, with respect to PUD zoning and the M-X-C classification, Rouse asserts that the preliminary development plan for these particular parcels, rather than the general parameters of M-X-C zoning, is what governs the intensity of use analysis.

Although Rouse recognizes that the rezoning of its properties to a more intensive use would violate the declarations of intent, it steadfastly contends that parcels 2 and 3 were not rezoned to a more intensive use under the PDP. According to Rouse, the hypothetical possibilities broadly sanctioned under M-X-C zoning are irrelevant because, once the PDP was adopted by the County, only the uses specifically authorized

by the PDP are permitted, and it is those uses that must be compared to the earlier R-R zoning. Rouse explains:

> The actual zoning is not to be found in the County zoning ordinance, which states only the limits within which zoning may be established on the property; rather, ... *it is that which is contained in the development plans that are approved and adopted by the County as part of the zoning process.* Therefore, the intensity of any M-X-C zone can only be determined by reference to *the uses actually permitted on that specific property or properties as reflected on those development plans.*

(Boldface added by Rouse).

In effect, Rouse claims that the Tax Court mixed apples and oranges in determining whether the rezoning resulted in a more intensive use of the land, because it erroneously compared the Euclidean R-R zone that formerly applied to all three parcels to the rezoned M-X-C classification for the PUD. Instead, Rouse asserts that the Tax Court should have compared the R-R zoning classification to the PDP adopted by the County when it approved the M-X-C zoning. In its brief, Rouse states:

> In order to determine whether a property in a Euclidean zone has been rezoned to a more intensive use, one need only look to the general County zoning ordinance to see what uses are permitted in that zone. On the other hand, to determine whether a property that has been rezoned to a PUD zone such as M-X-C has been rezoned to a more intensive use, one must look to the specific zoning plan that has been adopted for *that* property-in this case, the legislatively-adopted PDP. In short, M-X-C zoning is not a single construct. Because the zoning regulations binding a parcel of land zoned M-X-C are those approved *for that parcel*, it is axiomatic that the actual M-X-C zoning of any particular parcel of land is different from the M-X-C zoning of every other parcel. Thus, the M-X-C zoning and the permitted intensity of use on each of the three separate properties in this case is different from the M-X-C zoning of the other two properties, and the intensity of use permitted on each

separate property can only be determined by reference to the PDP.

Whether M-X-C is generally a more intensive zoning classification than R-R is, according to Rouse, besides the point. Instead, Rouse maintains that what matters is how the property is actually used, and actual use is controlled by the PDP. Rouse asserts: "[T]he intensity of use permitted on each separate property can only be determined by reference to the PDP." Rouse argues that, despite "all of the possible uses set forth in the general M-X-C zoning ordinance ... only specified residential and open space uses are permitted on Parcels 2 and 3" under the PDP.

Although Rouse concedes here that Parcel 1 will be used more intensively under the PDP than under the prior R-R zoning, it insists that parcels 2 and 3 remain eligible for the agricultural use assessment, because they were not rezoned to a more intensive use under the PDP. Appellant asserts:

> [I]t appears clear that, when two of three separate properties are rezoned in such a way that the uses permitted by the new zoning of those parcels are actually *less* intensive than the prior zoning, the rezoning cannot be said to have disqualified the properties from agricultural use assessment under TP § 8-209 or, by extension, to have violated the applicable declarations of intent under TP § 13-305.

Rouse relies on T.P. § 13-305(c)(2)(i), which specifically provides that the Ag Tax and penalty are only imposed on the non-complying "portion" of the land. In addition, Rouse emphasizes that T.P. § 8-209(h)(1)(ii) does not provide that property becomes ineligible for the agricultural use assessment if it is rezoned to a more intensive "zoning classification." Rather, the property is disqualified only if it is rezoned to a more intensive "use." Again, based on the legislatively approved PDP, which controls the use of each parcel, Rouse maintains that only Parcel 1 was rezoned to a more intensive use, and is therefore disqualified from the agricultural use assessment under T.P. § 8-209.

Because Rouse vigorously maintains that the courts involved throughout this case have not understood the concept of PUD zoning, and how it differs from traditional Euclidean zoning, we believe it is useful to discuss both concepts briefly.

■■■ "Zoning is concerned with dimensions and uses of land or structures...." *Friends of The Ridge v. Baltimore Gas & Elec. Co.*, 352 Md. 645, 655, 724 A.2d 34 (1999). "The term 'Euclidean' zoning describes the early zoning concept of separating incompatible land uses through the establishment of fixed legislative rules...." 1 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING (4th Ed. Rev. 1994), § 1.01(c), at 1-20 ("Rathkopf's"). Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts, specifying certain uses for each district. "Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial," and the "zones appear on the municipality's official zoning map." 5 Rathkopf's, § 63.01, at 63-1-2. In this way, the municipality "provides the basic framework for implementation of land use controls at the local level." 1 Rathkopf's, § 1.01(c), at 1-22.

■■■ "Modern zoning ordinances ... strive to meet society's current development needs" by providing "greater flexibility in zoning patterns." 5 Rathkopf's, § 63.01, at 63-2. A PUD is a particular type of zoning technique used "to obtain the level of flexibility needed to meet changing community needs." *Id.* at 63-3. In contrast to Euclidean zoning, which "divide[s] a community into districts, and explicitly mandate[s]" certain uses, *id.* at 63-4, the PUD is an " 'instrument of land use control which ... permits a mixture of land uses on the same tract.' " *Id.* (citation omitted). Generally, it "is a zoning technique that encompasses a variety of residential uses, and ancillary commercial, and ... industrial uses." *Id.* at 63-5.

In *Woodhouse v. Board of Comm'rs*, 299 N.C. 211, 261 S.E.2d 882 (1980), the court elucidated the concept of a PUD. It said:

A planned unit development, or PUD, is the development of a tract of land as a single entity which may include dwellings of various types, commercial uses, and sometimes industrial uses. . . . Such a planned unit "enables the builder to create, within the confines of a single development, a variety of housing types which . . . will [enhance] the possibilities of attractive environmental design and [provide] the public with open spaces and other common facilities." . . . The PUD "is a legislative response to changing patterns of land development and the demonstrated shortcomings of orthodox zoning regulations. . . . Currently, the improvement of land is in control of developers who assemble large tracts and improve the land for resale or rental. Given this modern pattern of land development, planners and legislators conceived a technique of land-use control which was better adapted to the realities of the marketplace." . . . Planned unit developments make it possible "to insure against conflicts in the use of land while permitting a mix of use in a single district." . . . The PUD concept "has freed the developer from the inherent limitations of the lot-by-lot approach and thereby promoted the creation of well-planned communities."

*Id.* at 891 (citations omitted).

Although a PUD permits greater "flexibility in development than is available under the general zoning ordinance provisions," 5 Rathkopf's, § 63.01, at 63-7, a municipality remains able " 'to protect the interests it normally protects through general zoning provisions.' " *Id.* (citation omitted). But, PUD zoning "is not a complete panacea for all that ails the world of zoning." *Id.* at 63-9. Indeed, one risk is the possible "misuse by developers." *Id.*

It is also important to consider Rouse's contention that, in a PUD, the PDP, not the M-X-C zoning classification, constitutes the zoning for purposes of the intensity of use issue. In our review of the relevant provisions of the County's Zoning Ordinance, we do not find quite the paramount authority accorded to the PDP that Rouse has attached to it.

Zoning Ordinance § 27-546.01(a)(1) provides that the purpose of an M-X-C zone is, *inter alia,* to "[c]reate a comprehensively planned community with a balanced mix of residential, commercial, recreational, and public uses." It is also intended to preserve "significant open spaces," § 27-546.01(a)(3), while providing "a variety of lot sizes and dwelling types" with "housing for a spectrum of incomes, ages, and family structures." Zoning Ordinance § 27-546.01(a)(6). The "substantial open space tracts" are supposed to be "superior to what could be obtained under conventional development techniques to serve a variety of scenic, recreational, and environmental conservation purposes." Zoning Ordinance § 27-546.01(7).

A "multistep review process" is required to obtain M-X-C approval, which will "promote the health, safety, and welfare" of the residents in the County. *See* Zoning Ordinance § 27-546.01(a)(1) (11). Moreover, under § 27-546.04, "[n]o land may be zoned M-X-C unless it consists of at least seven hundred fifty (750) contiguous gross acres."

Section 27-546.08 of the Zoning Ordinance lists the order of required approvals in regard to M-X-C zoning. The PDP is the earliest phase of a multistep process, followed by the CSP, concurrent submissions of the Preliminary Plat of Subdivision and the FDP, the Detailed Site Plan, Final Plat of Subdivision, and, finally, various building and occupancy permits.

Pursuant to § 27-199(c)(1)(k), the PDP "shall include a generalized drawing or series of drawings ... illustrating the proposed development with accompanying descriptive material" that sets forth the "proposed general layout" of roads, the number of acres to be devoted to various types of residential areas, community uses, and non-residential areas, proposed sites for recreational uses, parks, schools, retail centers, and other uses. Rouse suggests that the PDP is critical because the subsequent submissions must be consistent with the PDP. To be sure, each phase builds on what has already been submitted and approved. In his testimony, however, Lockard recognized that there is room for change after the PDP is

submitted, although the size of certain uses will be capped in accordance with the PDP.

Following approval of the PDP, the CSP is submitted, which must be approved by the Planning Board after a public hearing. Zoning Ordinance § 27-546.05(d)(1). In order to obtain approval, however, the CSP need only be *"generally consistent with the approved"* PDP. Zoning Ordinance § 27-546.05(d)(2)(A). (Emphasis added). Moreover, under § 27-546.05(c)(2)(H)(i), when a general use is provided, "any one of the uses within that category is permitted," and the "specific use need not be specified until the Detailed Site Plan is approved."

Ultimately, § 27-546.04(c) requires that "[t]he use of land within the M-X-C zone shall be limited to those uses specified *in the Final Development Plan."* (Emphasis added). In addition, § 27-546.06(e)(6) provides that an approved FDP shall be recorded in the Land Records of the County, and the provisions "as to land use shall bind the property covered thereby as provided . . . with the full force and effect of specific zoning regulations." After the FDP is recorded, "no change in primary use . . . from that permitted" in the FDP is allowed, except by an amendment. Zoning Ordinance § 27-546.06(e)(6).

The FDP may be filed with the Planning Board after expiration of the appeal period following approval of the CSP. Zoning Ordinance § 27-546.06(a)(1). The FDP must include drawings showing "precise boundaries of the proposed land uses. . . ." Zoning Ordinance § 27-546.06(c)(1)(A). Moreover, in order to gain approval, the FDP must "generally conform[ ]" to the CSP. Zoning Ordinance § 27-546.06(d)(2)(A). Significantly, the approved FDP remains "valid indefinitely." Zoning Ordinance § 27-546.06(d)(3).

We note, by analogy, that in the context of Howard County's creation of a floating zone known as a New Town District, which gave birth to Columbia, the developers were required to submit a preliminary development plan with their petition to obtain approval of the New Town District Zoning. *Howard Research and Development Corp. v. Howard County,* 46 Md.

App. 498, 500, 418 A.2d 1253 (1980). The Court recognized that the PDP "became the controlling blueprint" for the development. *Id.* at 507, 418 A.2d 1253. Nevertheless, the Court also observed that "actual development could not begin until the FDP gained approval from the Planning Commission." *Id.* at 507, 418 A.2d 1253. Thus, it was the FDP, not the PDP, that was considered to have the "full force and effect of a zoning regulation." *Id.* at 512, 418 A.2d 1253.

## III.

Appellant asserts that it "anticipated the possibility that a court might find that Parcel 1, on which all of the commercial and institutional uses, as well as most of the 'other residential' development, must be located under the PDP, had been zoned to a more intensive use." Therefore, Rouse argued, alternatively, that "if the Tax Court were to find that, because of the variety of uses permitted on Parcel 1, the rezoning resulted in a more intensive use [for Parcel 1] than previously existed under the R-R zoning, the remaining properties had to be analyzed individually, by reference to the PDP," to determine whether the zoning for parcels 2 and 3 was also more intensive than what was allowed under the prior R-R zoning.

Rouse acknowledges that in *Rouse I* we were of the view that if the three parcels were analyzed collectively, the overall re-zoning created a more intensive use than previously existed under the R-R zoning. But, Rouse also suggests that in *Rouse I* we specifically "rejected the Supervisor's argument that the three parcels had to be considered as a single unit, [merely] because none was large enough to qualify for M-X-C zoning on its own." We did not reject that position. Instead, we merely said that Rouse's alternative position was "arguable." *Rouse I,* 120 Md.App. at 698, 708 A.2d 19. Therefore, we remanded for the Tax Court to consider the question of whether a separate evaluation of intensity of use was required for each parcel.

We recognize the strength of Rouse's conviction that the PDP controls the intensity of use analysis. In our view, however, the question of whether the intensity analysis re-

quires a comparison of R-R zoning to the approved PDP, or, instead, a comparison of R-R to M-X-C zoning generally, is not dispositive of the issue that led to our remand in *Rouse I*. Even if, as Rouse urges, the intensity analysis requires a comparison of the R-R zone to the PDP, rather than to the M-X-C generally, that does not resolve the pivotal question of whether the intensity of use analysis is conducted separately for each parcel as a discrete unit, or, instead, for all three parcels collectively, as a single "package." Put another way, the central question that we must resolve is whether the R-R zoning must be compared to the PDP on a parcel-by-parcel basis or as a unitary tract.

In urging a parcel-by-parcel analysis with regard to the intensity issue, Rouse states: "[T]he M-X-C zoning and the permitted intensity of use on each of the three separate properties . . . is different from the M-X-C zoning of the other two properties, and the intensity of use permitted on each separate property can only be determined by reference to the PDP." Rouse also asserts:

> [T]he Tax Court failed to appreciate that the zoning on the subject properties is that set forth in the legislatively-adopted PDP, not the M-X-C text in the general zoning ordinance, which only contains general parameters that might be adopted in an M-X-C zone. Instead, the Tax Court held that the three parcels could not be evaluated separately because (a) it had been determined in *Rouse I* that M-X-C was a more intensive zone than R-R, and (b) all three parcels had been zoned M-X-C. Therefore, according to the Tax Court, each parcel must have lost its eligibility for an agricultural use assessment under TP § 8-209 and, *a fortiori*, had violated its declaration of intent. That, according to the Tax Court, ended the inquiry.

When Rouse purchased the three parcels in 1990, each was used for agricultural purposes as a sod farm, and assessed for agricultural use on that basis. In support of Rouse's contention that each parcel should be considered separately with respect to the agricultural use assessment and the Ag Tax, Rouse points out that each parcel was acquired from a different

transferor, was held under a separate deed, had its own individual tax account designation, was a discrete property on the assessment rolls, and is subject to its own declaration of intent. Rouse also relies on the text of T.P. § 13-305(c)(2)(i). As we noted, that provision states that if property subject to a declaration of intent fails to qualify for the agricultural use assessment under T.P. § 8-209, "the agricultural land transfer tax, plus penalty, is [only] due on *that portion of the land* that fails to comply with the declaration of intent or to qualify for farm or agricultural use." (Emphasis added). Additionally, Rouse argues that T.P. § 13-305 "reinforces" the view that each parcel is a separate unit, because the Ag Tax is imposed upon an "instrument of writing." As there were three deeds to three separate parcels, each parcel, according to Rouse, must be separately considered to determine whether it qualifies for the agricultural use assessment.

In analyzing the merits of Rouse's contention that each parcel must be separately analyzed, Rouse's position that the Ag Tax is due only on that part of the land that will be more intensively used derives largely from T.P. § 13-305. But, that provision cannot be analyzed in a vacuum. When we consider the statutory scheme as a whole, in light of the express legislative purpose, we do not believe that appellant's position comports with the clearly expressed public policy set forth in T.P. § 8-209, or with common sense. Moreover, T.P. § 13-305(c)(2)(i) is intertwined with T.P. § 8-209, and the language of T.P § 8-209 does not refer to a "portion" of the property.

In regard to whether the Tax Court was required to undertake a separate analysis of intensity of use for each parcel, we are guided by *Friends of the Ridge v. Baltimore Gas & Elec. Co., supra,* 352 Md. at 658, 724 A.2d 34. Although that case did not concern the Ag Tax, the Court's reasoning is helpful by analogy.

In *Friends of the Ridge,* the Court considered the granting to BG & E of a variance from side yard setback requirements. The Court concluded that no variance was needed, because BG & E, which owned contiguous parcels, could combine them

into a larger parcel without violating the zoning code. *Id.* at 648, 724 A.2d 34. In analyzing whether BG & E had merged its contiguous lots, the Court recognized the importance of the owner's intent, and noted that intent is a question of fact. *Id.* at 659, 724 A.2d 34. The Court said that a merger of contiguous lots may occur "if the owner of contiguous parcels of land intends to form one tract. The owner's intent 'may be inferred from his conduct with respect to the land and the use which he makes of it.' " *Id.* at 656–57, 724 A.2d 34 (citation omitted). Moreover, the Court observed that lots do not remain separate merely because they appear separately on a subdivision plan. *Id.* at 657, 724 A.2d 34. Writing for the Court, Judge Cathell concluded:

> We shall hold that a landowner who clearly desires to combine or merge several parcels or lots of land into one larger parcel may do so. One way he or she may do so is to integrate or utilize the contiguous lots in the service of a single structure *or project* ... For title purposes, the plotted lines may remain, *but by operation of law a single parcel emerges for zoning purposes.*

*Id.* at 658, 724 A.2d 34. (Emphasis added; footnote omitted).

As we previously indicated, to qualify for M-X-C zoning, the tract must consist of *at least* 750 acres. Thus, not one of Rouse's parcels, standing alone, would have qualified for M-X-C zoning.[11] As a result, Rouse intentionally combined the three parcels of property into one for the purpose of obtaining approval from the County for the M-X-C zoning. To that end, Rouse also submitted *one* application and *one* PDP to rezone all three parcels to an M-X-C classification. The significance of Rouse's conduct in a case as thorny as this one cannot be overlooked.

Because Rouse used all three properties to obtain the desired M-X-C zoning, and submitted one PDP for the entire property, we are satisfied that Rouse intended to create one

---

**11.** As we said earlier, Parcel 1 contains approximately 473 acres, Parcel 2 consists of approximately 330 acres, and Parcel 3 contains approximately 246 acres.

larger, unitary parcel. Indeed, Rouse cannot have it both ways. It sought to obtain the rezoning by aggregating the three parcels and submitting one PDP. By combining the three parcels to attain the M-X-C zoning, it follows that the intensity of use analysis should be made by analyzing the three parcels as if they were one. *Cf. Supervisor of Assessments of Baltimore County v. Sloan,* 57 Md.App. 286, 469 A.2d 915 (1984) (interpreting former Art. 81 (1980 Repl. Vol.), § 14 and concluding that two parcels of adjoining, subdivided land owned by the same taxpayers were not to be assessed as one homestead, where one lot was used for residence and the other lot was used for recreation and a garden). This is also consistent with the zoning map, which did not separate the property into three parcels, but considered them as one larger piece of property for purposes of qualifying for the PUD.

In reaching our conclusion, the recent case of *Supervisor of Assessments of Baltimore County v. William Cardinal Keeler,* 362 Md. 198, 764 A.2d 821 (2001), is instructive, although it did not involve the Ag Tax. There, the Court considered whether 16.5 acres of open space, which was part of a 27 acre parcel, should be included within the tax exemption afforded by T.P. § 7-204 for actual and exclusive religious worship. The Catholic Church had obtained a special exception in Baltimore County to construct a church on the property, but construction was limited to a 7.5 acre development envelope, except for storm water management and a septic system, which were installed outside the envelope. As the case made its way through the administrative process, the Church demonstrated that the entire parcel was considered as a "package," *id.* at 206, 212, 764 A.2d 821, because the whole site was used as the setting for the church, and the open space enhanced the religious experience. The appellee also argued that the findings that the entire site was an integral part of the church were supported by substantial evidence and entitled to deference. *Id.* at 212, 764 A.2d 821. In a four to three decision, the Court upheld the exemption for the entire property, with the exception of one acre of the land that was used for residential purposes. *Id.* at 202, 764 A.2d 821.

In sustaining the exemption, the majority agreed that the 16.5 acre portion of the parcel did not have a use different from the rest of the property, despite the fact that it consisted of open land, which could not be developed for 60 years. *Id.* at 213, 764 A.2d 821. Indeed, the Court said that the open space was not "divisible from the remaining exempt acreage," *id.* at 213, 764 A.2d 821, or otherwise "ancillary" to it. *Id.* at 214, 764 A.2d 821. Additionally, the Court was mindful of the Tax Court's conclusion that the County Board of Appeals "structured the property as a package, and that the church was effectively prohibited from using the open space for any residential or commercial purpose for the next 60 years." *Id.* at 215, 764 A.2d 821.

In reaching its conclusion, the Court was satisfied that the Tax Court understood the legal and factual issues in the case, and properly considered the property as "a unitary parcel." *Id.* at 221, 764 A.2d 821. In words pertinent here, the Court said: "We believe that the determination of whether a parcel of land is tax exempt does not turn on the property's level of development. Rather, under § 7-204 the exemption depends on the actual use of the property and whether that religious worship is exclusive. In the present case, *it does not follow that, merely because the appellee has been required, or decided, to leave a large portion of the church property undeveloped, the property is not being used . . . .to enrich its worship experience." Id.* at 220, 764 A.2d 821. (Emphasis added). Thus, the Court rejected the appellant's position "that a parcel of land consisting of more physical space than is minimally necessary to construct the main structure is, by default, subject to demarcation for taxing purposes." *Id.*

Writing for the majority, Chief Judge Bell reasoned:

Where a portion of a parcel of real property on which a church has been constructed is, by virtue of zoning and covenants restricted to open space use, thus prohibiting any other use, that does not serve automatically to demarcate the parcel, nor does it necessarily serve to infringe, usurp, or preempt the primary use of the property. In the case sub judice, the 16.5 acres provide a natural setting for the

church and, thus, the religious worship use. As such, they are being actively used by the church for religious worship, as, by the way, the Order of the County Board of Appeals for Baltimore County directed. The decision that the 16.5 acre parcel is a part of a whole or entire package was found and reiterated by the Property Tax Assessment Appeals Board for Baltimore County, the Maryland Tax Court, and the Circuit Court for Baltimore County. Each such decision, and in particular that of the Tax Court, is supported by substantial evidence in the record. Accordingly, we affirm the judgment of the Circuit Court, which upheld the decision of the Tax Court.

*Id.* at 222, 764 A.2d 821.

Applying the rationale of *Keeler* here, we are persuaded that the Tax Court properly determined that the contiguous parcels had to be considered as a single unit with respect to T.P. §§ 8-209 and 13-305, even if parcels 2 and 3 contain large areas of open space and will not be as intensively used under the PDP as they could have been under the earlier R-R zoning. Clearly, the parcels are interrelated and are designed to function together. Moreover, a certain amount of open space is required to obtain M-X-C zoning, and therefore was included in the PDP. Put another way, to implement the goals of the PUD, a portion of the land had to be dedicated to open space. Because parcels 2 and 3 contain the areas designated for open space, Rouse was able to use Parcel 1 for more intense purposes. The overall plan, however, depends on an integrated use of all three parcels. Merely because portions of parcels 2 and 3 will not be intensely developed does not alter the reality that the project will result in more intense use of certain portions of the land, regardless of the particular uses of parcels 2 and 3. As in *Keeler,* parcels 2 and 3 are not divisible.

Although Rouse vigorously maintains that *Maisel v. Montgomery County, supra,* 94 Md.App. 31, 614 A.2d 1333, has no application here, because it involved Euclidean zoning, we continue to find portions of it instructive. In *Maisel,* at the appellants' request, the county rezoned a 4.5 acre parcel from

a single-family residential zone to a townhouse residential zone. The original zone permitted 5 or 6 dwelling units per acre, depending on the price of the housing, while the new zone permitted a maximum of 8 dwelling units per acre. Eventually, the owners obtained approval of a development plan that only contained 27 townhouse units; the number of residences was thus equal to the total number of dwelling units that could have been built under the prior zoning. Nevertheless, when the owners sold the property, they were assessed a rezoning transfer tax, because the subject property was considered to have been rezoned to a "more intensive use." *Id.* at 35, 614 A.2d 1333. The taxpayers challenged the tax, claiming that the property was not rezoned to a more intensive use, because the maximum number of permitted dwelling units remained unchanged.

In a theme familiar here, the taxpayers contended that the "binding restrictive elements contained in the Council's approval of the rezoning amendment" limited the number of dwelling units to what existed under the prior zoning, and should control the issue of liability for the transfer tax. *Id.* Conversely, the appellee contended that the "eventual densities" were irrelevant. *Id.* Rather, the appellee argued that the proper comparison required a review of the "statutorily permitted densities in the various zones." *Id.* Relying on the definition in the County Code of the term "rezoned to a more intensive use," which included rezoning to a category that permitted a greater number of dwelling units per acre than had been previously allowed, appellee contended that the townhouses themselves, permitted under the rezoning, resulted in an "inherently ... more intensive form of development...." *Id.* at 35–36, 614 A.2d 1333. The Tax Court agreed, stating: "[W]hat triggers this tax is not what you ended up with ....when you move from one zoning classification to another ... whether or not you are able to utilize or get the benefit of each and everything that's permitted under that zone, I don't think it makes any difference." *Id.* at 36–37, 614 A.2d 1333.

On appeal, this Court affirmed. After examining the legislative purpose, we determined that although the appellants agreed to "limit one aspect of this intensification," *id.* at 37, 614 A.2d 1333, they nonetheless intensified the development of the property in several other respects. *Id.* Interestingly, we rejected the appellants' argument that the number of dwelling units permitted under the rezoning "became a legislative act," because it was adopted by the County Council when it approved the rezoning. *Id.* at 38, 614 A.2d 1333. We agreed with the Tax Court that the requirements for the rezoning transfer tax had been met, because the new zone permitted a greater density, regardless of whether it was implemented. We said: "The Tax Court found that the rezoning transfer tax must be paid when a property is transferred after being rezoned to a residential zone which statutorily permits a greater number of dwelling units than the prior zone, without reference to the number of dwelling units that may be eventually built on the property. . . .[W]e hold that [the] Tax Court correctly interpreted the applicable law." *Id.* at 39, 614 A.2d 1333.

In *Rouse I*, we stated: "We do not believe . . . that the Tax Court was *required* to consider a decrease in density as dispositive in determining whether the property was rezoned to a more intensive use." *Rouse I*, 120 Md.App. at 691, 708 A.2d 19. Thus, even if the density of Parcels 2 and 3 will be less than what was permitted under R-R, we said that this would not necessarily be dispositive of the issue; it merely represents one factor in the "more intensive use" determination.

As we see it, the logic of Rouse's position as to Parcel 1 compels the conclusion that all three properties were zoned to a more intensive use, when viewed as a single "package." As we noted earlier, Rouse now acknowledges that Parcel 1 was rezoned to a more intensive use under the PDP, even though only 53 acres of Parcel 1, out of a total of 473, will actually be used more intensively. Rouse candidly concedes that an argument that the Ag Tax should apply only to the 53 acre portion of Parcel 1, rather than to the entire parcel, "would obviously

fly in the face of the statute and should be given short shrift." Despite that forthright acknowledgment, Rouse insists that parcels 2 and 3 should be analyzed separately, by reference to the PDP's prescribed uses for each one, because "the zoning regulations binding a parcel of land zoned M-X-C are those approved *for that parcel....* " If, as Rouse concedes, the 53 acres in Parcel 1 are not separate for purposes of the intensity analysis with regard to Parcel 1, then parcels 2 and 3 are not separate units, either. To the contrary, all the parcels are part of a larger whole, and the "more intensive use" of Parcel 1 disqualifies the entire tract from the benefit of the agricultural use assessment. This view accurately reflects the interrelated nature of the three parcels in the context of the PUD, and squares with the purpose of the statutory scheme.

## CONCLUSION

In this case, imposition of the Ag Tax on all three parcels is consistent with the policy of inhibiting property owners from making an end run around the statute, which was intended to favor continued agricultural use of land. By filing declarations of intent with the SDAT at the time of purchase, Rouse declared its intent to continue the agricultural use of all three parcels for a full five years, and thereby avoided payment of the Ag Tax. Rouse subsequently obtained the benefit of M-X-C zoning for a PUD by use of all three parcels. It doing so, it crafted a PDP based on the broad parameters of that zoning category. The PDP is an integrated concept, and the artificial lines that appellant now seeks to engraft on the land, by use of the PDP, fly in the face of the legislative purpose in creating the statutory tax exemption.

The expressed legislative intent evidenced in T.P. § 8-209(b) is an important underpinning of the agricultural use assessment. The Legislature sought to disqualify those owners who ultimately take an action inconsistent with a declaration of intent. Appellant's attempt to isolate and protect portions of the rezoned parcels by reliance on artificial lines of demarcation and the use of the PDP amounts to an attempt to camouflage what we described in *Rouse I* as "the continuum

toward an urban or industrial environment." *Rouse I,* 120 Md.App. at 691, 708 A.2d 19. If we were to adopt Rouse's position, we would surely exalt form over substance.

Our review of the Tax Court's opinion leads us to conclude that the Tax Court did not misapprehend the nature of the M-X-C zone as a PUD, with an approved PDP specific to Rouse's property, when it determined that the three parcels constituted a single tract for purposes of the more intensive use analysis. In its opinion determining that the rezoning resulted in a more intensive use, the Tax Court expressly acknowledged Rouse's arguments and its memorandum regarding the actual uses of Parcels 2 and 3 as "residential and open space" zones under the PDP.

Finally, we are satisfied that our ultimate conclusion is consistent with the long settled principle that, because the agricultural use assessment constitutes a tax exemption, it must be strictly construed in favor of the taxing authority. *Maryland-Nat'l Capital Park and Planning Commission, supra,* 348 Md. at 17, 702 A.2d 690; *State Dep't of Assessments and Taxation v. Belcher,* 315 Md. 111, 118, 553 A.2d 691 (1989); *Warlick v. Supervisor of Assessments of Anne Arundel County,* 272 Md. 540, 545, 325 A.2d 587 (1974); *Perdue Foods, Inc. v. State Dep't of Assessments & Taxation,* 264 Md. 672, 687–88, 288 A.2d 170 (1972); *Comptroller of the Treasury v. Fairland Market, Inc.,* 136 Md.App. 452, 458, 766 A.2d 187 (2001); *B.F. Saul Real Estate Inv. Trust v. Clerk of Circuit Court for Anne Arundel County,* 110 Md.App. 455, 462, 677 A.2d 660 (1996), *cert. denied,* 343 Md. 332, 681 A.2d 68 (1996); *Maisel,* 94 Md.App. at 39, 614 A.2d 1333. What the Court of Appeals stated in *Perdue, Inc. v. State Dept. of Assessments & Taxation,* 264 Md. 228, 286 A.2d 165 (1972), is relevant:

> It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, "to doubt an exemption is to deny it."

*Id.* at 232–33, 286 A.2d 165 (quoting *Pan Am. Sulphur Co. v. State Dep't of Assessments & Taxation,* 251 Md. 620, 629, 248 A.2d 354 (1968)).

Of course, a strict construction of a tax-exemption statute "does not preclude a fair one." *State Dep't of Assessments and Taxation v. Maryland-National Capital Park and Planning Commission,* 348 Md. 2, 18, 702 A.2d 690 (1997). We believe the result here is consistent with the legislative intent and, therefore, it is fair.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**