874 A.2d 470

**David H. REMES**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

**No. 122, Sept. Term, 2004.**

Court of Appeals of Maryland.

May 12, 2005.

Reconsideration Denied June 15, 2005.

54

David H. Remes (Douglas M. Bregman and Heather Libman Blauer of Bregman, Berbert, Schwartz & Gilday, L.L.C., Bethesda, MD), on brief, for appellant.

Marc P. Hansen, Chief Counsel (Charles W. Thompson, Jr., County Atty., Karen L. Federman Henry, Principal Counsel for Appeals, and Malcolm F. Spicer, Jr., Asst. County Atty., Rockville, MD), all on brief; Debra Yerg Daniel, Associate General Counsel (Adrian R. Gardner, General Counsel, and Michele Rosenfeld, Associate General Counsel, the Maryland-National Capital Park and Planning Com'n, Silver Spring, MD), all on brief; William Kominers (Philip T. Evans and Erica A. Leatham of Holland & Knight, L.L.P., Bethesda, MD), all on brief, for appellees.

Argued before BELL, C.J., RAKER, CATHELL, BATTAGLIA, GREENE, and JOHN C. ELDRIDGE (Retired, Specially Assigned) and LAWRENCE F. RODOWSKY (Retired, Specially Assigned), JJ.

CATHELL, Judge.

In this case, David H. Remes, petitioner, owner of a home located in Silver Spring, seeks to establish whether directly-adjacent property, which formerly was owned by Jonathan C. Duffie, and was later transferred by Mr. Duffie to Design–Tech Builders, Inc. ("Design–Tech"), respondent, is deemed to have merged for zoning purposes under the common-law

principles described in *Friends of the Ridge v. Baltimore Gas & Elec. Co.*, 352 Md. 645, 724 A.2d 34 (1999).

Under the circumstances of this case, the Court is called upon to determine if Design–Tech was properly granted a building permit by the Montgomery County Division of Permitting Services ("DPS") and whether the Montgomery County Board of Appeals ("the Board" or "the County"), respondent, properly interpreted the relevant provisions of the Montgomery County Code, Subdivision Regulations, and Zoning Ordinance in respect to the issuance of a building permit. Our review shall address the following questions:

1. Did the Montgomery County Board of Appeals correctly rule that two contiguous lots had not undergone a zoning merger and a building permit for one of the lots was, therefore, properly issued?

2. Did the Montgomery County Board of Appeals correctly find that a single-family dwelling proposed to be built on one lot did not exceed the height requirements of the Montgomery County Zoning Ordinance? [1]

We hold that the Board of Appeals incorrectly failed to find that Lot 11 and Lot 12 had merged for zoning purposes. Because we hold that there occurred a zoning merger of Lot 11 and Lot 12 notwithstanding the provisions of Montgomery County Code § 50–8, it is unnecessary to reach a determination whether the Board properly approved a cellar as a non-counting story in calculating the permissible height of the applicant's proposed single-family dwelling.[2]

---

**1.** In Montgomery County height is apparently determined by first establishing the "natural grade."

**2.** We note however that "natural grade" would include the grade of the land prior to any work in respect to the use that is the subject of an application. In virtually every subdivision of land, the land is prepared and graded long before the lots are conveyed and prior to applications for individual permits. Over time, farming changes the grades that theretofore existed. Grades may have been changed centuries before. In many instances it would be impossible to determine a purely "natural grade." Natural grade as used in most land use regulations, subject to constitutional requirements, normally might mean the grade, howev-

## I. Facts and Procedural History

This case involves property in the Woodside Park neighborhood of Silver Spring, Maryland, consisting of several parcels created by a 1945 subdivision and located in an R–60 zone which allows single-family detached residential homes. The primary parcels at issue, as originally laid out in the subdivision, are Lot 12, a corner lot with access both to Noyes Drive toward the north and to Fairview Road toward the east, acquired by husband and wife, Ralph J. Duffie and Violette P. Duffie ("elder Duffies") in 1951 on which they constructed their home, and its westerly adjacent neighboring lot, Lot 11, acquired by the elder Duffies in 1954. A semi-circular driveway serving the home on Lot 12 was constructed by the Duffies over and through both Lot 11 and Lot 12. A Montgomery County Department of Permitting Services permit card, found among DPS' records, indicates that a building permit was also issued in June 1959 to the elder Duffies, for construction of a swimming pool[3] on Lot 11 as an accessory use to their home on Lot 12, and a building permit was issued to the Duffies in October 1963, presumably for the construction of an addition to the Lot 12 home. At the time of its original construction around 1951, the Lot 12 home had the required seven-foot[4] side yard setback and twenty-foot rear yard setback. The 1963 addition extended thirteen feet into the twenty-foot rear setback. This construction changed the

---

er created, that legally exists or was or could be legally created, prior to or at the time of any land preparation for a specific project that is the subject of the application at issue; otherwise no building permits could ever be issued.

**3.** There is some evidence in the record that, as of January 2003, the pool may have been demolished.

**4.** The elder Duffies' home apparently was constructed according to the provisions of Montgomery County's 1950 Zoning Ordinance. The 1954 zoning ordinance established a minimum side yard setback of *eight* feet and maintained the twenty foot rear yard setback requirement. The current zoning ordinance, likewise, requires lots in this zone to have an eight-foot side yard set back and a twenty foot rear yard setback. *See* Montgomery County Zoning Ordinance § 59–C–1.323(b), regarding setback from the adjoining lot.

side and rear yards of Lot 12, resulting in encroachments into the setback requirements on the Lot 11 side of the house.

Following the deaths of Violette Duffie in 1988 and Ralph Duffie in 1999, their son, Jonathan C. Duffie, ("Mr. Duffie"), as Personal Representative of the latter's estate, deeded the property to himself. This "Personal Representative's Deed," dated August 31, 2001, describes the subject property, in relevant part, as follows:

"Lot numbered eleven (11) and twelve (12) of a resubdivision of original Lot numbered two (2) in Block lettered 'A–2' of the subdivision known as 'Woodside Park', as per plat of said resubdivision recorded in Plat Book 26, folio 1614, in the Land Records of Montgomery County, Maryland.

. . .

"The improvements thereon being known as *8920 Fairview Road.*"

Apparently, up until the 2003 request to separate Lot 11 and Lot 12 for tax assessment purposes, both lots had been assessed as one lot under the single address of 8920 Fairview Road. More important even is that the use of the swimming pool on subdivision Lot 11 was initially described as an accessory structure to the house on Lot 12, and remained in that status at least through the 2001 reassessment. Accordingly, at least in 1959, the relevant governmental officials considered the swimming pool on Lot 11 as an accessory use to the structure on Lot 12. At that time the Montgomery County Zoning Ordinance defined accessory use as "a use of a building, lot, or portion thereof, which is customarily incidental and subordinate to the principal use of the main building or lot." *See* Montgomery County Zoning Ordinance (1958) § 107–2, Definitions. In 1960, and since, the definition was changed to read "building lot, or portion thereof." Even after the 1960 amendment, which deleted the comma between building and lot, the relevant governmental officials continued to treat the swimming pool as an accessory use to the home on Lot 12.

On December 10, 2002, DPS, the agency, one of whose functions is to determine whether a proposed development complies with the zoning ordinance,[5] issued to Design–Tech Builders, Inc., respondent, a building permit for construction of a single-family dwelling on Lot 11, Block A–2, Woodside Park, 1102 Noyes Drive, Silver Spring. At that time Design–Tech was not the owner of the lot. On January 8, 2003, petitioner noted an "Appeal Charging Error in Administrative Action or Determination" to respondent Montgomery County Board of Appeals asserting that DPS had issued erroneously a building permit for 1102 Noyes Drive/8920 Fairview Road for the following reasons:

"1. The permit authorizes construction of a second building on a single lot, in violation of Code § 59–A–5.2.

2. The permit authorizes construction of a building that violates the building height limitation of Code § 59–C–1.327(a), in that (a) the height is greater than 35′ when measured along the average elevation of the front of the building; and (b) the height exceeds 2½ stories, in that the lowest level is a basement (and therefore a story), not a cellar, as those terms are defined in the Code, § 59–A–2.1."

Mr. Duffie executed a deed dated January 15, 2003, to convey Lot 11 to Design–Tech and this transfer was recorded in the Land Records of Montgomery County on January 30, 2003. Design–Tech intended to build on the property a single-family dwelling, similar to that which it had constructed on at least thirteen other lots in the locality. Following this transfer, the respondents requested that the Maryland Department of Assessments and Taxation reassess the parcel as two separate lots. The lots had been assessed and billed as a single account since at least 1974. The Department then requested that Mr. Duffie and Design–Tech provide appropri-

---

5. Montgomery County Code § 8–26, "conditions of permit," requires the permit issuing agency to establish that the building complies with zoning regulations.

ate information in order that Lot 11 could be assessed separately.

Petitioner (and his wife) filed a Complaint for Declaratory and Injunctive Relief in the Circuit Court for Montgomery County on January 29, 2003, seeking to declare Lot 11 and Lot 12 merged and seeking also to rescind the sale of Lot 11 from Mr. Duffie to Design–Tech, and enjoin any further sale of Lot 11. This declaratory judgment action was stayed during the pendency of the administrative appeal before the Board of Appeals.

The Board of Appeals held hearings on Mr. Remes' appeal of DPS' issuance of a building permit, in which Design–Tech intervened, on February 26 and March 5, 2003. After hearing the testimony of several witnesses, the Board issued a written opinion on May 29, 2003, denying the administrative appeal and concluding that Lot 11 and Lot 12 had not merged. In its conclusions of law, the Board of Appeals stated, *inter alia:*

"Lot 11 is a properly recorded lot, which is independent of Lot 12. [Petitioner] argues that Lots 11 and 12 merged into one lot, while DPS and Design–Tech argue that Lots 11 and 12 were complementary but independent lots. The Board agrees with DPS and Design–Tech. Although [petitioner] did establish that the Duffies may have intended to treat Lots 11 and 12 as one single lot, the Board does not agree that their intentions are determinative of the issue." [Alterations added.]

The Board then quoted extensively from Design–Tech's Memorandum of Law:

" 'Montgomery County has codified the procedures for the formal combination, assembly or other "merger" of already recorded lots (or unrecorded parcels) in Chapter 50 of the Montgomery County Code. The procedure culminates with the recordation of a new plat describing the newly created, "merged" lots to effectuate any assembly. Lot 11, as shown on the permit plans, is a recorded lot pursuant to a plat recorded in 1945 in Plat Book 26 at Plat Number 1614. Since that time, no additional subdivision or resubdivision

procedures were initiated and no new plat was recorded; therefore, Lot 11 remains a valid subdivided, individual lot with the ability to support a building permit and related residential structure.'

"The Board also believes that [petitioner's] reliance on *Friends of the Ridge v. Balt. Gas & Elec. Company,* 352 Md. 645, 724 A.2d 34 (1999) is misplaced. In *Ridge,* the Court of Appeals held that **for zoning purposes,** adjacent lots held by the same owner could merge by operation of law as a result of the intentions and actions of the owner. But Judge Catthel [sic] stated unequivocally in *Ridge* that subdivision is not zoning, that zoning ordinances do not create lots, and that the construction of structures over more than one parcel would not affect lot lines. He stated first: 'We have often held that subdivision is not zoning.' *Ridge,* at 648, n. 4, 724 A.2d 34. He later states: 'Zoning ordinances ... **do not create lots** (emphasis in original).' *Ridge,* at 651, 724 A.2d 34. He finally states: '... the construction of structures extending over more than one parcel or lot would not, in our view, affect the boundary lines (or lot lines) of the two parcels. They remain in place until a deed of conveyance or a new subdivision ... is created.' *Ridge,* at 661, 724 A.2d 34.

"Unlike *Ridge,* this is not a zoning variance case, it is a building permit case. The only issue for permit purposes is whether the lot was a properly recorded lot which met the development standards of the zone.[6] Lot 11 is a properly

---

**6.** This is not so. Compliance with the requirements of zoning and zoning codes, where they exist, are generally necessary before permits may be issued. The Montgomery County Zoning Ordinance provides as follows:

" § **59–A–3.1. Building permit.**

(a) **Building permits generally.** A building permit must be issued by the director before any building or other structure can be erected, moved, structurally altered, added to, or enlarged and before any excavation can be started. A building permit is not required for any building or structure to be used exclusively for purposes of agriculture upon land used exclusively for agriculture. However, a building permit is required for any building or structure to be used for a purpose that is not exclusively agricultural in nature, including spe-

recorded lot, and no plat has ever identified the 'merger' of Lots 11 and 12 into a third larger lot. Therefore, based upon the subdivision plat recorded in the land records of this County, we believe that Lot 11 is a properly recorded independent lot." [Alteration added.] [Bolding original.] [Footnote added.]

The Board of Appeals declined Mr. Remes' request for reconsideration of its decision.

On June 27, 2003, petitioner filed a petition for judicial review in the Circuit Court for Montgomery County of the Board of Appeals' decision. The Montgomery County Planning Board of the Maryland–National Capital Park and Planning Commission ("MNCPPC"), in its capacity as the general oversight body for the physical development of the Capital region, sought to intervene as an additional respondent in this judicial review and the Circuit Court granted this request on December 17, 2003. Following a March 22, 2004, hearing, the Circuit Court issued an order on April 5, 2004, affirming the Board of Appeals' decision. On May 6, 2004, petitioner noted an appeal to the Court of Special Appeals. Before the intermediate appellate court could hear the case, this Court, on its own initiative, issued a writ of certiorari. *Remes v. Montgomery County*, 384 Md. 581, 865 A.2d 589 (2005).

----

cial exception uses, even though located on otherwise agricultural land, and (ii) any equestrian facility building or structure intended for use by participants or spectators at an equestrian event.

(b) A building permit may be issued only for proposed work that conforms to the uses and amount of development authorized under this chapter *or other applicable law* and for which the adequacy of public facilities is determined after:

(1) Review of a preliminary plan of subdivision or site plan if required under this chapter or chapter 50 [subdivision regulations]; or

(2) Building permit review if required under chapter 8 [Buildings]."

[Alterations added.] [Emphasis added.]

Moreover, as we explained *supra*, compliance with zoning requirements is a function of the permitting process under the Montgomery County Code. The permit application procedure, is further explained in Chapter 8, Buildings, of the Montgomery County Code. *See infra*.

## II. Discussion

██ Much of the debate in the instant case arises from an issue this Court raised, but did not have need to address, in our *Friends of the Ridge* opinion. Specifically, we there surmised:

"An owner of contiguous parcels who erects a structure in what would ordinarily be a setback of one of the individual parcels might, under this doctrine, *although we do not now decide it,* also cause a combination of lots thus restricting the future alienability of the unbuilt upon parcel because the conveyance of that parcel would cause the property upon which the structure is built to be in violation of the ordinance. Such an owner would also risk being forced to bring that parcel into conformity by removing the structure from the setback."

352 Md. at 658 n. 11, 724 A.2d at 41 n. 11 (emphasis added).

While petitioner operates under the belief that Lot 11 and Lot 12 have merged for zoning purposes, the respondents, and specifically Montgomery County, in oral argument, succinctly summarized their position as follows:

"Montgomery County asks the Court not to extend the *Ridge* doctrine in situations where a developer has borrowed open space from an adjacent lot to satisfy setback requirements on the lot being developed. *Ridge*, in footnote eleven, leaves that issue for another day, and I guess this is the day." [7]

### A. Zoning Merger

Petitioner grounds his argument that Lot 11 and Lot 12 have "functionally" merged for zoning purposes pursuant to our decision in *Friends of the Ridge v. Baltimore Gas & Elec.*

---

7. We are unaware of a legal rationale for "borrowing open space" from adjacent lots. How do you borrow open space? More importantly, under circumstances such as exist here, how is it "repaid" or returned? If Lot 11 is considered a separate unrestricted lot, from where does the "pay back" come? What would happen is that the open space "borrowed" would never be returned, thus creating an illegal non-conforming use on Lot 12 from the point in time when Lot 11 separated.

*Co.,* 352 Md. 645, 724 A.2d 34 (1999), wherein we recognized the existence of the doctrine of zoning merger in Maryland. We described zoning merger to be the merger for zoning purposes of two or more lots held in common ownership where one lot is used in service to one or more of the other common lots solely to meet zoning requirements. Petitioner argues that *Ridge* is an equitable doctrine that seeks to prevent lots from being broken up in such a way that would create zoning violations. In *Ridge,* respondent Baltimore Gas and Electric Company ("BG&E") sought to increase the capacity of its electric substation. In order to effectuate this expansion, BG&E acquired additional parcels of land contiguous with the parcel on which the existing substation was located and BG&E attempted *to create* a new resubdivision. It was argued that its attempt to create a formal resubdivision was inadequate. We did not address that particular controversy, resolving the case on the assumption that no proper formal resubdivision had occurred.

BG&E sought and was granted a public utility special exception to operate a larger capacity substation. BG&E also applied for a variance from the side yard setback require- ments. In considering BG&E's request, the Baltimore Coun- ty Board of Appeals determined that the variance criteria of the Baltimore County Zoning Ordinance did not apply. In response to the *Ridge* petitioners' concerns with the propriety of BG&E's lot consolidation, we stated that, as to *Ridge,* "[w]e are concerned here only with the applicability of the zoning ordinance's variance provisions and not Baltimore County subdivision regulations." *Id.* at 649–50, 724 A.2d at 36.[8] We sustained the Board of Appeals' conclusion, reasoning that there was no need for BG&E to obtain a variance from the zoning regulations [9] because BG&E's intended use of its three

---

8. As we have generally stated, zoning and subdivision are normally separate and distinct regulatory entities. *See Ridge,* 352 Md. at 650 n. 4, 724 A.2d at 36 n. 4 ("We often have held that subdivision is not zoning.").

9. But for the land area requirement of the increased substation sought by Baltimore Gas & Electric, there is no indication that the lots

contiguous parcels as one parcel effectively overcame the conditions triggering the need for a variance. Thus, BG&E was permitted to use the entire parcel for its substation expansion, provided that its proposal met the setback requirements as measured from the exterior property lines of the combined parcel. Specifically, this Court held, "unless the ordinance's language specifically and clearly prohibits it, an owner of contiguous parcels of real property . . . is free to combine them into larger and fewer parcels without violating the *zoning* code." *Id.* at 648, 724 A.2d at 35–36.[10] In reaching our resolution, we examined the mechanisms triggering the doctrine of zoning merger in other jurisdictions and observed that merger had been applied to "prohibit[ ] the use of individual substandard parcels if contiguous parcels have been, at any relevant time, in the same ownership and at the time of that ownership, the combined parcel was not substandard." *Id.* at 653, 724 A.2d at 38. We also stated:

> "We see no reason why a doctrine that seeks to prevent the proliferation or use of nonconforming, undersized lots by holding that they have been combined or merged into a larger parcel should not, as far as zoning is concerned, be applied properly to permit the creation, *through the combining by use of a larger parcel from already conforming smaller parcels,* without the necessity of official action or conveyancing."

*Id.* at 654, 724 A.2d at 38 (emphasis added).

■ The facts of the instant case, as one may suppose, present issues somewhat differently than the facts in *Ridge.* In *Ridge,* BG&E, as the "developer," sought a conclusion that its three lots *had merged* for zoning purposes so that it might possess a land assemblage of sufficient size, with sufficient setbacks to allow it to enlarge its electricity substation. In

------

acquired by BG&E were undersized or otherwise substandard, in and of themselves.

**10.** When we referred to the "ordinance" in this statement we were referring to the zoning ordinance, not subdivision regulations.

the case at bar, respondents seek the conclusion that Lot 11 and Lot 12 *have not merged*, for varying reasons including that informal lot consolidation, according to respondents, is not available other then by formal plat submission in Montgomery County and so that Mr. Duffie might sell Lot 11 to Design–Tech, the "developer," who seeks to build a single-family dwelling on this piece of land.[11]

We indicated in *Ridge* that merger may be derived from the common owner's intent, as evidenced by "integrat[ing] or utiliz[ing] the contiguous lots in the service of a single structure or project...." *Id.* at 658, 724 A.2d at 40 (alterations added). Intent is to be derived from the facts. *Id.* at 659, 724 A.2d at 41; *see also Rouse–Fairwood Devel. Ltd. Partnership v. Supervisor of Assessments for Prince George's County,* 138 Md.App. 589, 630, 773 A.2d 535, 559 (2001); *Iannucci v. Zoning Bd. of Appeals,* 25 Conn.App. 85, 87, 592 A.2d 970, 971 (1991) (stating that intent of the owner "may be inferred from his conduct with respect to the land and the use which he makes of it"). In reviewing scenarios from varying jurisdictions, we noted that "[s]ome cases discuss automatic merger, but most require that the intent of the owner to merge the parcels be expressed, though little evidence of that intent is required." *Ridge,* 352 Md. at 653, 724 A.2d at 38.

■■ Petitioner contends that, in applying *Ridge* to the instant case, Lot 11 and Lot 12 remain separate for subdivision purposes, but are combined for zoning purposes. This is, indeed, a correct articulation of the thrust of zoning merger: zoning merger does not cause a nullification of any subdivision that has previously occurred. It merely consolidates lots insofar as the determination of what can be constructed upon that land, or what uses can be made of it, bearing in mind the requirement that one must comply with zoning requirements including area, setback, etc. "For title purposes, the platted lot lines may remain, but by operation of law a single parcel

---

11. The doctrine of zoning merger deals with zoning limitations and uses, not with title.

emerges for zoning purposes." *Ridge,* 352 Md. at 658, 724 A.2d at 34.

█ Respondents urge that merger in Montgomery County may arise only from a formal replatting. Thus, according to the respondents, other indicia of merger such as common ownership, contiguous parcels, use of one or more lots in service of another, offer no evidentiary import and are of little moment in Montgomery County. They are incorrect. The respondents read this Court's decision in *Ridge* as narrowly focused on the realm of zoning, and to this effect, Montgomery County insists that "the Court limited its ruling to the zoning requirements and did not address the subdivision perspective of creating lots." The respondents' assertion illustrates a point, that we emphasized in *Ridge,* and that bears repeating: zoning merger is not a resubdivision. When zoning merger occurs, the lots remain divided. Thus, zoning merger, in effect, is an adjustment of zoning requirements. It has no effect on subdivision. Title examiners regularly consider aspects of zoning when examining titles in order to be able to indicate to purchasers the uses that can be made of a property. Those uses have no effect on subdivision regulation. One must comply with *both* zoning and subdivision requirements. In the present case, the applicant cannot meet zoning requirements because of the doctrine of zoning merger and thus, while Lot 11 may be sold, it cannot be used, absent zoning variances or other zoning relief, if any.

Simply because an applicant submits documents articulating plan specifications, engineering details, and a plot diagram showing details of the building to be erected [12] does not

---

**12.** Montgomery County Code, Chapter 8, Buildings, mandates, in relevant part, the required components for permit application as follows:

" § 8–24. **Application for permit.**

. . .

(f) *Plot diagram.* There shall also be filed in duplicate with each application for a building or occupancy permit, a plot plan drawn to scale showing:

(1) The lot upon which the proposed building is to be erected, lot dimensions, lot and block numbers and subdivision name, if any . . . . "

remove the fact that the instant lot may be part of some larger zoning configuration—a configuration that arose through a common owner's use of the property, if not through schematics. Each case must be examined on its own. In the case at bar, there is ample evidence to conclude the elder Duffies intended to use their Lot 11 and Lot 12 as one property for zoning purposes: the pool on Lot 11 violates (or violated) the prescribed setbacks from the street and from Lot 12, unless it was dedicated for zoning purposes to Lot 12, and from the time of its creation was thus an accessory use to the structure or use of Lot 12; the additions to the house on Lot 12 encroach upon that lot's setbacks; the circular driveway traverses both Lot 11 and Lot 12; until very recently the lots were assessed for tax purposes as a single parcel; and the subsequent personal representative's deed conveying Lot 11 and Lot 12 to Mr. Duffie described a single lot comprised of two lots, in that it reads "Lot numbered eleven (11) and twelve (12)." [13] Thus, petitioner maintains that the building permit for the construction of a single-family dwelling on Lot 11 was issued in error and its issuance violates the current relevant provisions of the Montgomery County Zoning Ordinance, which prohibit a second single-family dwelling on a single lot, as follows:

"§ 59–A–5.2. **Buildings to be located on lots.**

Section 8–26 further provides, among the several conditions associated with issuance of a building permit, that the building must meet the zoning requirements. This section states, in relevant part:
"§ 8–26. **Conditions of permit.**

. . .

(g) *Compliance with zoning regulations.* The building or structure must comply with all applicable zoning regulations, including all conditions and development standards attached to a site plan approved under Chapter 59 [subdivision regulations]. The issuance of a permit by the Department for the building or structure does not affect an otherwise applicable zoning regulation." [Alteration added.]

13. Design–Tech urges that the Personal Representative's Deed contains a typographical error in denominating the lots and that the single taxation was simply a matter of convenience. The actuality of either of these possibilities is not dispositive.

Every building hereafter erected shall be located on a lot, as herein defined; and, except as provided in this chapter, there shall be not more than one single-family dwelling on one lot.

## § 59–A–5.3. Yards and open spaces generally.

No building shall be erected, nor shall any existing building be altered, enlarged, moved or rebuilt, nor shall any open space surrounding any building be encroached upon or reduced in any manner not in conformity with the yard, lot, area and building location regulations hereinafter designated for the zone in which such building or open space is located, except as otherwise specifically provided.

No yard or other open space provided about any building for the purpose of complying with the provisions of this chapter shall be considered as a yard or open space for any other building; and no yard or other open space of a building on one lot shall be considered as a yard or open space for a building on any other lot." [14]

---

**14.** The elder Duffies acquired Lot 12 in 1951 and Lot 11 in 1954. The 1955 version of this section of the zoning ordinance, adopted originally in December 1953 and effective January 1, 1954, provided as follows:

"**§ 107–4. General regulations.**

. . .

(c) *Area.*

(1) No building shall be erected, nor shall any existing building be altered, enlarged, moved or rebuilt, nor shall any open space surrounding any building be encroached upon or reduced in any manner, except in conformity with the yard, lot, area and building location regulations hereinafter designated for the zone in which such building or open space is located, except as otherwise specifically provided.

(2) No yard or other open space provided about any building, for the purpose of complying with the provisions of this chapter, shall be considered as a yard or open space for any other building; and no yard or other open space on one lot shall be considered as a yard or open space for a building on any other lot."

Thus, the only way that the permit for the addition to the structure on Lot 12 (as well as the pool) could have been legally issued was for the two lots to have been considered one parcel for zoning purposes.

The 1958 version of the zoning ordinance, adopted May 1958 and effective June 1958, is slightly altered from its predecessor:

"**§ 107–4. GENERAL REGULATIONS.**

. . .

### B. Montgomery County's Zoning Ordinance and Subdivision Regulations

Montgomery County is somewhat unique in the source and exercise of its municipal authority to regulate the use of land. As this Court explained in *Pan American Health Organ. v. Montgomery County,* 338 Md. 214, 657 A.2d 1163 (1995):

"Montgomery County is a charter county under the Home Rule Amendment. *See* MD. CONST. art. XI–A. Section 5 of Maryland Code (1957, [2001] Repl. Vol., [ ]) Article 25A, known as the Express Powers Act, enumerates the powers that are granted to and conferred upon any county that forms a charter under the provisions of the Home Rule Amendment.

Montgomery County's zoning power, however, derives exclusively from the Regional District Act [enacted by Chapter 448, Acts of 1927].... [Amended] in 1939 and currently codified in Article 28 of the Maryland Code, creates the Regional District, which now encompasses all of Montgomery County and most of Prince George's County. Maryland Code (1957, [1997] Repl. Vol., [2001] Cum. Supp.) Art. 28, § 7–103.

---

c. **Area.**

(1) Yards and open spaces.

(a) No building shall be erected, nor shall any existing building be altered, enlarged, moved or rebuilt, nor shall any open space surrounding any building be encroached upon or reduced in any manner not in conformity with the yard, lot, area, and building location regulations hereinafter designated for the zone in which such building or open space is located, except as otherwise specifically provided.

(b) No yard or other open space provided about any building for the purpose of complying with the provisions of this Ordinance shall be considered as a yard or open space for any other building; and no yard or other open space *of a building* on one lot shall be considered as a yard or open space for a building on any other lot." [Alteration emphasized.]

As indicated, the essential language of this section of the current zoning ordinance is unchanged from that found in the 1958 version. *Compare,* § 107–4(b) (1958), *supra,* with the current Montgomery County Zoning Ordinance § 59–A–5.3 (b), *supra.*

The Regional District Act establishes two mechanisms for land use planning. The first mechanism is through zoning. Under the Regional District Act, the county councils of Montgomery and Prince George's Counties each serve as 'the district council for that portion of the regional district lying within [the] county.' Art. 28, § 8–101(a). Each district council 'may by ordinance adopt and amend the text of the zoning ordinance and may by resolution or ordinance adopt and amend the map or maps accompanying the zoning ordinance text.' *Id.* § 8–101(b)(2). Thus, the Montgomery County Council has been designated as the District Council and has broad authority to adopt and amend the text of the zoning ordinance to regulate 'the location and uses of buildings and structures.' Art. 28, § 8–101(b)(2)(v).

The second mechanism is known as the mandatory referral process. Under the Regional District Act, the Maryland–National Capital Park and Planning Commission ('M–NCPPC') is empowered to adopt 'a general plan for the physical development of the [Regional] District.' 1939 Maryland Laws ch. 714, § 4, at 1489 (codified as amended at Art. 28, § 7–108). Section 7–112 of Article 28 (the 'mandatory referral provision') provides that proposals for certain public projects shall be referred to the M–NCPPC for nonbinding review."

*Pan American Health,* 338 Md. at 217–18, 657 A.2d at 1164–65 (footnote omitted) (some alterations added) (some citations omitted). Thus, Montgomery County's zoning authority arises from the Regional District Act, and is regulated by the provisions of the Montgomery County Code.

The respondents offer two primary objections to Mr. Remes' contention that Lot 11 and Lot 12 have merged. First, the respondents urge that lot merger, by any method other than formal plat submission, is unavailable according to the Montgomery County Code.[15] Second, the respondents

---

**15.** Respondents contend that Montgomery County's building code, subdivision regulations, and zoning ordinance each contain language specifically prohibiting the merger conclusion advanced by Mr. Remes. The

maintain that merger is intended to combine substandard, undersized, or nonconforming lots,[16] not to rectify setback encroachments and, because at no time have Lot 11 and Lot 12 been deemed substandard according to any of the iterations of Montgomery County's Zoning Ordinance development standards,[17] the issue before this Court, according to the respondents, thus, is not one of merger, but rather a question of whether the Montgomery County Department of Permitting Services properly issued a building permit for Lot 11. As a corollary to the latter argument, the County notes that County law, dating back at least to the mid 1950's "has prohibited the use of an adjoining lot to satisfy zoning setback require-

---

County adds that these articulated prohibitions serve two important purposes: First, the language prevents the County's Department of Permitting Services from bearing the burden of having to consider the circumstances of surrounding lots, as well as the propriety of granting the permit in light of any surrounding lots, when presented with a permit application. Second, persons looking to buy vacant property are not left to perform exhaustive title searches solely to determine if the lot of interest has ever been in common ownership with surrounding lots and there may have been created zoning encumbrances arising from the uses of surrounding lots.

However, we have not been directed to any language in the zoning code that prohibits the applicability of the doctrine of zoning merger. As far as we have been made aware, there is nothing in the Montgomery County Zoning Ordinance that would prohibit the County (or whatever appropriate entity) from amending its *zoning* code to prohibit zoning merger. Such a prohibition must be done carefully in order that the problem of the creation of non-conforming uses be properly addressed and resolved. Modifications of subdivision regulations, without the modification of zoning ordinances, normally would not suffice. Zoning and subdivision are typically separate concepts.

16. This idea is apparently based on our statement in *Ridge:*

"As far as we can discern, the zoning doctrine of lot merger has never been applied in any jurisdiction to limit the creation of parcels that exceed minimum dimensional requirements; merger has been applied only to prohibit the later creation of undersized parcels." *Id.* at 653, 724 A.2d at 38. The attempt to limit merger might, under some circumstances, raise constitutional issues.

17. The current development standards are found in Montgomery County's Zoning Ordinance, at Chapter 59 of the Montgomery County Code. Lot 11 and Lot 12 are located in the R–60 Zone allowing single-family detached residential dwellings and requiring a minimum lot area of at least six thousand square feet.

ments. . . . " Thus, even if the elder Duffies might have imagined that Lot 11 would "absorb" the setback deficiencies by their Lot 11 pool and Lot 12 home additions, the setback requirements delineated in Montgomery County's zoning ordinance prohibit such adjacent lot encumbrance and Lot 11 never *actually* fulfilled this role in service of Lot 12. What respondents fail to acknowledge is that the zoning merger that occurred in this case forestalled the creation of a non-conformity on Lot 12. Without the use of Lot 11 as accessory to Lot 12, the uses of both lots would have violated the zoning ordinance.

Mr. Remes urges that *Ridge* mandates that the owner of Lot 11 and Lot 12 make a choice: either formally combine the parcels so as to enable Lot 11 to satisfy the appropriate setbacks for the structure on Lot 12, or cure the setback deficiencies on Lot 12 and then subdivide the merged Lot 11 and Lot 12. Thus, petitioner argues that the fact that neither Lot 11 nor Lot 12 have ever been deemed undersized is relevant only to the issue of remedy; it has no bearing on whether these are merger-eligible lots. He is correct. Petitioner further maintains that the *Ridge* doctrine applies without regard to the *positive* law of a municipality, *i.e.,* what affirmative steps the local *subdivision* regulations might require in order to recognize a formal zoning merger of lots, because the underlying policy of *Ridge* seeks to protect zoning requirements, requirements which are separate and apart from subdivision regulations. Again he is correct.

 As we explained in *Ridge,* zoning differs from planning; the latter of which embodies the requirements of subdivision. We stated:

"Zoning does not create parcels of real property. What zoning ordinances normally do, with respect to residential districts, is establish dimensional minimums, such as minimal lot, parcel or tract size, yard sizes (the distance between buildings and property lines), and the height of structures. In addition, such ordinances specify the number of residential units that may be placed upon the area of a tract or

parcel (density), ancillary requirements such as parking minimums, bathroom minimums, and square footage minimums of buildings. Additionally, zoning ordinances can, to some extent, regulate uses of property, as distinct from dimensional requirements."

*Id.* at 650–651, 724 A.2d at 37. Effectively, zoning dictates what one can build on, or how one may use his property while subdivision or planning determines how the land is divided. It is entirely possible that subdivision regulations are utilized to create separate lots while, at the same time, zoning principles establish limitations on the uses of lots, limitations that can extend across lot lines.

The respondents vigorously exhort that zoning merger "by operation of law," *see Ridge,* 352 Md. at 658, 724 A.2d at 40, is unavailable in Montgomery County. In arguing that *Ridge* is inapposite, the County states that "[u]nlike Baltimore County, Montgomery County law clearly prohibits subdivision by intent, requiring instead that a property owner submit a plat for recording in the land records to combine or divide land." The County points to the language of current Montgomery County Code § 50–8, found in the chapter governing subdivision of land, which provides as follows:

"**§ 50–8. [ ]-Filing and approval of plats.**

Whenever any subdivision or resubdivision of land is proposed to be made within the district, and before any contract for the sale of or any offer to sell such subdivision is made, or before any development or construction of any building takes place within a subdivision or any part thereof, the subdivider thereof or his agent shall file, in accordance with procedure prescribed in this chapter, a plat of the proposed subdivision with the board for its approval and the approved record plat shall be recorded in the land records of the county, except as provided in section 50–9 [exceptions to platting requirements]." [Alterations added.]

Montgomery County further contends that given its "long history of imposing exacting requirements for subdivision, which includes requirements for combining or dividing parcels,

the doctrine of merger stands diametrically opposed to the clear dictates of County law." According to the County, then, the owner's intent—and presumably the owner's actual use—plays no part in a finding of merger (or resubdivision) unless there has been a formal adjudication by the County's land use regulatory authority.

In a related argument Design–Tech suggests that the elder Mr. Duffie could not have intended to merge the lots when the common law of this State did not formally recognize zoning merger until such time as the filing of *Ridge* on February 11, 1999. Specifically, Design–Tech states in a footnote:

"Even if this Court were to extend *Ridge* in favor of [petitioner's] position in this case, it would be inappropriate to give such a ruling a retroactive application to cover the actions taken by the owner of Lot 11 and Lot 12 in the 1950's and 1960's. *See, e.g. Julian v. Christopher,* 320 Md. 1, 10–11, 575 A.2d 735, 739–40 (1990); *Kelley v. R.G. Indus., Inc.,* 304 Md. 124, 140, 497 A.2d 1143, 1150–51 (1985) (changes to common law are generally restricted to prospective application)." [Alteration added.]

In essence, Design–Tech seems to be arguing that zoning merger, since it is based, in part, on the owner's intent, must run with the person, and not with the land; alternatively, Design–Tech may be arguing for zoning merger to come into Montgomery County, but only *after* Design–Tech buys Lot 11 and builds its house, *i.e., prospectively.*

The facts indicate that the elder Mr. Duffie died on August 16, 1999, and Mr. Duffie (the son) did not convey Lot 11 and Lot 12 to himself until August 31, 2001. There is no indication that, in those intervening two years, there were any changes on Lot 11 or Lot 12 that altered or ameliorated the encroachments or that removed one lot from the service of the other. Thus, technically, there was a period, after *Ridge,* and before the elder Mr. Duffie's death, during which the elder Mr. Duffie held both lots. Also, for two years following his death the lots were not yet deeded (by personal representative's deed) to Mr. Duffie (the son). During those two years, the

encroachments (*i.e.,* the use of Lot 11 in service of the needed Lot 12 setbacks) remained.

In addition, the cases cited by Design–Tech do not support the position of prospective application of the common law. *Julian v. Christopher,* 320 Md. 1, 10–11, 575 A.2d 735, 739–40 (1990), was a case dealing with contractual restrictions on the alienability of leasehold interests in which this Court stated:

"In appropriate cases, courts may 'in the interest of justice' give their decisions only prospective effect. Contracts are drafted based on what the law is; to upset such transactions even for the purpose of improving the law could be grossly unfair. Overruling prospectively is particularly appropriate when we are dealing with decisions involving contract law. The courts must protect an individual's right to rely on existing law when contracting. Ordinarily decisions which change the common law apply prospectively, as well as to the litigants before the court."

Design–Tech also cited this Court's opinion in *Kelley v. R.G. Indus., Inc.,* 304 Md. 124, 161, 497 A.2d 1143, 1161–62 (1985) (a products liability case prompting changes to Maryland common law tort principles in respect to gun manufacturers' offering of "Saturday Night Specials"). We stated:

"One final matter warrants discussion, namely the effective date of the modification in Maryland common law tort principles which is set forth in Part III of this opinion. Ordinarily in a case such as this, which changes common law principles applicable to civil actions sounding in tort, we would apply the change to the case before us and prospectively to all such causes of action accruing after the date of the case before us."

*Kelley,* 304 Md. at 161, 497 A.2d at 1161–62 (citation omitted). In *Kelley,* this Court determined that, based upon the particular circumstances in that case in respect to the Court's recognition that the wrongful conduct was related to the gun manufacturers' *marketing* of their product, the changes to the common law of tort effected by *Kelley* would not apply to all causes of action arising from a gunshot wound inflicted by a

"Saturday Night Special," but would apply to the *Kelley* plaintiff as well as to other causes of action accruing after the date of the *Kelley* mandate. *Julian* and *Kelley* were a contract case and a products liability case, respectively; they do not apply to the facts of the instant case and do not support Design–Tech's position.

Generally, changes in the common law are applied prospectively, as well as to the case triggering that change in the common law. In *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d 506 (1983), this Court abrogated the common law of interspousal immunity and applied the abrogation to *Boblitz* as well as to all such cases accruing after the filing of the *Boblitz* opinion. *Id.* at 275, 462 A.2d at 522. *But see Williams v. State*, 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981) (noting that "particularly in criminal cases, changes in the common law ordinarily should have only prospective effect when considerations of fairness are present"). The Court will hesitate to apply a change to the common law in the case before it where such a change would be contrary to a public policy set forth by the General Assembly. *See Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 460, 456 A.2d 894, 903 (1983) (stating that the Court "has been particularly reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State"). *See also Murphy v. Baltimore Gas & Elec. Co.*, 290 Md. 186, 428 A.2d 459 (1981), overruled on other grounds by *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 705 A.2d 1144 (1998); *Condore v. Prince George's County*, 289 Md. 516, 532, 425 A.2d 1011, 1019 (1981). We perceive no such declared public policy that should prevent us from finding a zoning merger where two lots held in common ownership were clearly used in the service of one another in order to satisfy zoning requirements and subsequent to *Ridge* remained in that category.[18]

---

**18.** We do not need to, nor do we now address, the situation where lots may have been combined in the past, but legally separated before our decision in *Ridge*. If that were the present case, which it is not, respondents' argument *might be* more persuasive. However, lots that

Moreover, as we perceive it, *Ridge* was a statement of the common law, not a change. The issue had not theretofore arisen, or been specified or articulated in our prior cases. *Ridge* was merely the first case to determine that zoning merger existed in Maryland.

Montgomery County goes on to state that "[b]y definition, subdivision includes both the division of land into one or more lots and the assembly of one or more lots or parcels into a larger one. [Montgomery County] Code § 50–1. [According to the County, t]o combine lots in Montgomery County, a property owner must prepare and submit a plat showing the resubdivision. When the Planning Board approves it, the plat is then recorded in the County land records. [Montgomery County] Code § 50–8" (alterations added). The terms "subdivision" and "resubdivision" are defined in the current Montgomery County Subdivision Regulations as follows:

"§ 50–1. **Definitions.**

. . .

*Resubdivision:* A change in any lot line of a recorded lot or parcel of land. Resubdivision includes the assembly of recorded lots or parts of lots. A resubdivision is a subdivision.

. . .

*Subdivision:* The division or assemblage of a lot, tract or parcel of land into one (1) or more lots, plots, sites, tracts, parcels or other divisions for the purpose, whether immediate or future, of sale or building development and, when appropriate to the context, relating to the process of subdividing or to the land or area subdivided; provided, that the definition of subdivision shall not include a bona fide division or partition of exclusively agricultural land not for development purposes. A resubdivision is a subdivision."

---

remained combined, or encumbered by the doctrine of zoning merger at the time of *Ridge,* and since, are clearly subject to its effects.

The respondents endeavor to distinguish the facts of the case *sub judice* from the circumstances in *Friends of the Ridge,* observing that Baltimore County, the locus of *Ridge,* had no statute or ordinance specifically prohibiting that merger.[19] The text of the relevant provisions of the Baltimore County Code are set out in the margin. We fail to perceive the degree of distinction between the Baltimore County and the Montgomery County provisions urged on the Court by respondents. Both, regardless of labels, address division of parcels and combining of parcels. Thus, the crux of the respondents' position is that no merger "by operation of law" occurred because the common owner of Lot 11 and Lot 12 did not undertake a formal "anti-subdivision" process to consolidate the lots as contemplated by Montgomery County's subdivision

---

**19.** The Baltimore County Code, Planning, Zoning and Subdivision Control Article, Development Title, includes the following relevant subdivision provisions:

"**§ 32–4–101. Definitions.**

. . .

(p) *Development.* 'Development' means:

. . .

(3) The combination of any two or more lots, tracts, or parcels of property for any purpose;

. . .

(yy) *Subdivision.* 'Subdivision' means:

(1) The division of property into two or more lots; or

(2) The combination of lots, parcels, tracts, or other units of property previously divided for the purpose, whether immediate or future, of sale, rental, or building development.

"**§ 32–4–108. Prohibition on Transfer of Land.**

(a) *In general.* A person may not convey a lot, parcel, or tract of a subdivision unless a plat, if required, has been recorded in accordance with this title and the plat is effective at the time of the conveyance.

. . .

"**§ 32–4–201. In General.**

Except as provided in §§ 32–4–105 [Agricultural exemptions], 32–4–106 [Limited exemptions], and 32–4–107 [Waivers] of this title, an approved Development Plan is required for a development and a plat is required for a subdivision. [Alterations added.]

. . .

"**§ 32–4–271. Required.**

(a) *In general.* The applicant shall prepare a plat in accordance with the approved Development Plan for any subdivision."

regulations.[20] Simply because a formal combination of Lot 11 and Lot 12 did not occur as contemplated by the Montgomery County Code, however, does not lead us to the necessary conclusion that these lots for zoning limitations are not subject to the doctrine of zoning merger. The issue is not subdivision combination but zoning merger.

The respondents assert that the mandatory language of Montgomery County Code § 50–8 ("the subdivider thereof or his agent shall file . . . .") precludes any use of the land that is inconsistent with the filed subdivision plat. As we have indicated, however, zoning concerns one's use of land, not how it is formally divided. The MNCPPC points to the intermediate appellate court's decision in *Lee v. Maryland National Capital Park and Planning Comm'n,* 107 Md.App. 486, 668 A.2d 980 (1995), an opinion which pre-dates this Court's *Ridge* opinion, as dispositive of the availability of merger by operation of law in Montgomery County. In *Lee* the MNCPPC approved "the resubdivision [*i.e.,* a *subsequent* subdivision] of two lots in the Glen Hills area into six lots." *Id.* at 488–89, 668 A.2d at 982 (alteration added).[21] Following a petition for

---

**20.** Montgomery County also questions its ability to prosecute and/or remedy any "unapproved" merger of Lot 11 and Lot 12 and subsequent construction undertaken by the property's owner decades ago, noting that Md.Code (1973, 1998 Repl. Vol.), § 5–114 of the Courts and Judicial Procedure Article sets a statute of limitations as follows:

"**§ 5–114. Setback line restrictions.**
 . . .
 (b) *In general.* . . .
 (2) A governmental entity may not initiate an action or proceeding arising out of a failure of a building or structure to comply with a setback line restriction more than 3 years after the date on which the violation first occurred if the building or structure was constructed or reconstructed:
 (i) In compliance with an otherwise valid building permit, except that the building permit wrongfully permitted the building or structure to violate a setback line restriction; or
 (ii) Under a valid building permit, and the building or structure failed to comply with a setback line restriction accurately reflected in the permit."

**21.** This was the opposite of combining two parcels into a larger parcel through zoning merger.

judicial review in the Circuit Court for Montgomery County brought by neighboring landowners who argued that the resubdivision was not consistent with the rural character of the neighborhood, the circuit court affirmed. The neighbors appealed and the intermediate appellate court reversed, holding that although the MNCPPC *considered* the seven statutory subdivision criteria found in Montgomery County Code § 50–29(b)(2),[22] there was not substantial evidence that the Board found that the proposed subdivision *complied* with all seven criteria. *Lee,* 107 Md.App. at 495, 668 A.2d at 985. The Court of Special Appeals explained:

> "Compliance with the criteria ensures that the lots will be of the same character as existing lots in the neighborhood, block, or subdivision. To prove that the seven criteria have been met, lots need not be cookie cutter matches to existing lots in the neighborhood. The correlation, however, between area, size, shape, street frontage, alignment, width, and suitability for residential use of the proposed resubdivided lots and existing lots must be high in order to meet the requirements of section 50–29."

*Id. Lee* is inapposite. As we have emphasized repeatedly, merger of the type here present is a function of, and limited to, zoning. To find zoning merger in the case *sub judice* affects no change to the decades-long status quo of the formal dimensions of Lot 11 and Lot 12; it merely affects the uses to which Lot 11 and Lot 12 may be put.

The County's position specifically, and the other respondents' position generally, suggests their belief that those

---

22. These seven subdivision criteria are as follows:
"§ 50–29. Lot design.
. . .
(b) Additional requirements for residential lots.
. . .
(2) *Resubdivision.* Lots on a plat for the resubdivision of any lot, tract or other parcel of land that is a part of an existing subdivision previously recorded in a plat book shall be of the same character as to [1] street frontage, [2] alignment, [3] size, [4] shape, [5] width, [6] area and [7] suitability for residential use as other lots within the existing block, neighborhood or subdivision." [Alterations added.]

actions which are not legislated do not happen. Montgomery County's having legislated a formal process for land subdivision does not necessarily mean that such results, *i.e.*, a limitation on uses, might not otherwise come about. We stated in *Ridge:* "We shall hold that a landowner who clearly desires to combine or merge several parcels or lots of land into one larger parcel may do so. One way he or she may do so is to integrate or utilize the contiguous lots in the service of a single structure or project...."[23] *Id.* at 658, 724 A.2d at 40. That is precisely what the elder Duffies did when, in making additions to their home and in constructing a pool on a lot adjacent to their home, they employed Lot 11 in the service of Lot 12 for zoning purposes. Their *use* of Lot 11 and Lot 12 in concert is consistent with zoning merger. That they did not undertake to submit a formal replatting to the County[24] does not vitiate the manner in which they *used* their property.

---

**23.** For instance, there is no indication that the elder Duffies constructed a swimming pool on Lot 11, the contiguous parcel to Lot 12 on which their family home was located, to serve other than the elder Duffies' home located on Lot 12. Moreover, the circular driveway transversed both lots.

**24.** The 1955 Montgomery County Subdivision Regulations contain the following provision:

"**§ 106-2. Procedure for preparation and filing of plats.**

(a) Whenever any subdivision of land is proposed to be made, and before any contract for the sale of, or any offer to sell such subdivision or any part thereof is made, the subdivider thereof or his agent shall file a plat of the proposed subdivision with the commission for its approval. Such plat and all procedure relating thereto shall, in all respects, be in full compliance with the provisions of the regulations set out in this chapter.

(b) The subdivider shall prepare a preliminary subdivision plat...." [Footnote omitted.]

The 1965 Montgomery County Subdivision Regulations reflect changes made to the regulations in 1961. Specifically, the words "or resubdivision" were added as follows:

"**§ 104-7. Filing and recording of plats required.**

Whenever any subdivision *or resubdivision* of land is proposed to be made within the district, and before any contract for the sale of or any offer to sell such subdivision is made, or before any development or construction of any building take place within a subdivision or any part thereof, the subdivider thereof or his agent shall file, in accordance with procedure described in this chapter, a plat of the pro-

*1. What becomes of Lot 12 in the absence of Lot 11?*

■■■ Another question that would be left wanting, should this Court approve the agencies' approval of a building permit issued for Lot 11, is what becomes of Lot 12? We begin by noting that one of the primary goals of zoning and subdivision controls is to avoid the creation of nonconforming lots (and uses) and "to restrict undersize parcels, not oversized parcels." *Ridge,* 352 Md. at 653, 724 A.2d at 34; *see Fred McDowell, Inc. v. Wall Twp. Bd. of Adjustment,* 334 N.J.Super. 201, 224, 757 A.2d 822, 835 (App.Div.2000) (invoking *Loechner v. Campoli,* 49 N.J. 504, 231 A.2d 553 (1967), New Jersey's seminal zoning merger case which we discussed in *Ridge,* and stating "merger is employed to further the goal of bringing (or keeping) nonconforming lots into conformity with the zoning ordinance and thereby serving the overall goals of the master plan"). Thus, based on the setback encroachments existing as a result of the structures on Lot 12, the proposed construction on Lot 11 would make Lot 12, if in separate ownership, a new and illegal nonconforming lot, unless, under the doctrine of zoning merger, the uses of Lot 11 are appropriately limited.

Montgomery County notes that a single building may not extend across lot lines, even internal lot lines.[25] It is not

---

posed subdivision with the board for its approval and the approved record plat shall be recorded in the land records of the county...." [Alteration emphasized.] [Footnote omitted.]
"Resubdivision" is not found among the definitions in either the 1955 or the 1965 subdivision regulations.

**25.** The subdivision regulations provide, in relevant part:
"**§ 50–20. Limitations on issuance of building permits.**
. . .
(b) A building permit may not be approved for the construction of a dwelling or other structure, except those strictly for agricultural use, which is located on more than one (1) lot, *which crosses a lot line,* which is located on the unplatted remainder of a resubdivided lot, or which is located on an outlot...." [Emphasis added.]
The constitutionality of this provision in the Montgomery County Code is not before us.
In the instant case, the structure on Lot 12 does not traverse the lot line delineating Lot 11 and Lot 12, but rather the structure on Lot 12 extends so as to fail to have sufficient setbacks from Lot 11. We note

disputed that Lot 11, with an area of eight thousand square feet, if considered in a vacuum, exceeds the minimum six thousand square feet lot size required in the R–60 zone, and satisfies the setback requirements. On the other hand, Lot 12, while of sufficient area for the zone,[26] does not, *by itself,* without the use of Lot 11, possess the required side yard and rear yard setbacks on account of the configuration of the structures constructed upon it. To allow Lot 11 to be used, as proposed, thus creates an illegal nonconformance as to Lot 12 and, by implication, grants an improper variance as to the rear yard setback for Lot 12.[27] Should this Court permit Lot 11 to be so used and a home constructed thereon, what becomes of Lot 12's ability to comply with the existing rear yard and side yard setback requirements? Such action effectively waives the zoning requirements as to Lot 12.

The County, apparently recognizing that if its position were to be accepted by this Court it will have permitted the creation of an illegal nonconforming use, seeks to relieve the Court of concern, assuring that "this Court need [ ][not] apply *Ridge* to prevent a nonconforming use that might result from an owner treating merged lots as separate. . . . Based on the setback requirements and the longstanding rejection of attempts to treat adjoining lots as one without formal resubdivision, the encroachment of the [elder Duffies'] addition into the setbacks remains a matter for DPS to handle through enforcement or when the owner of that lot seeks an additional building permit in the future"[28] (alterations added).

---

that a building that goes right to the lot line is the same thing as crossing the lot line for zoning purposes. That is, the setback requirements are still violated.

26. Lot 12 measures 11,182 square feet-well in excess of the R–60 zone's required 6,000 square foot lot size.

27. We do not comment as to whether variance procedures can be used to obtain a variance for Lot 12.

28. The County has already expressed, however, its doubt about its ability to prosecute a code violation that occurred more than three

The Court must consider, however, the possibility that a Montgomery County landowner of multiple lots might utilize a "parcel A" to assuage zoning violations on an adjacent companion (and thus, nonconforming) "parcel B," and later benefit from the sale of "parcel A" without correcting conditions causing the nonconformance of "parcel B." Moreover, in relying on merger arising only from a formal resubdivision platting, a common owner might "fly under the radar" by simply refraining from submitting a new resubdivision plat. That is, the owner would assert zoning merger for purposes of complying with zoning requirements, but two lots for purposes of subdivision and sale (free of zoning limitations). In this way, the common owner could flip-flop between his or her adjacent parcels, thwarting the intent of the land development regulations and, perhaps more egregiously, skirting Montgomery County's "exacting requirements for subdivision." The owner would have the benefit of avoiding zoning violations by treating the parcels as merged for zoning purposes, but later seek benefit from the sale of two separate valuable parcels of land. That is exactly what is occurring in the instant case.

## 2. Title to Lot 11 and Lot 12

Mr. Duffie acquired title to a lot composed of Lots 11 and 12 from his father's estate. At that time zoning merger had already occurred. The respondents contend that, should we find zoning merger of Lot 11 and Lot 12, our decision will wreak havoc on the title search procedures that a landowner who seeks to buy property must undertake. That is, the respondents urge that there must be an exhaustive title search in order to determine if two or more lots were ever held in common ownership and may have been used in a manner suggesting zoning merger. Such a practice, according to respondents, can lead to clouds on title and undermine zoning and subdivision laws. As stated by the MNCPPC, "every situation involving the application of the merger doctrine for

---

years ago. *See* Md. Code (1973, 1998 Repl. Vol.), § 5–114 of the Courts and Judicial Procedure Article, addressing setback line restrictions.

subdivision matters could potentially involve a factual dispute over whether a prior or current owner ever 'desired' [*i.e.,* intended] to merge the lots" (alteration added).

■■■ As we have indicated previously, a common owner of property who constructs a building on one lot which incorporates space from an adjacent lot in order to fulfill setback requirements still maintains two separate lots for title purposes. *See Ridge,* 352 Md. at 658, 724 A.2d at 34. *See also Rouse–Fairwood Devel. Ltd. Partnership v. Supervisor of Assessments for Prince George's County,* 138 Md.App. at 630, 773 A.2d at 559 (stating that this Court, in *Ridge* "observed that lots do not remain separate merely because they appear separately on a subdivision plan").

Surveys are available to answer many of the title questions that might arise. Surveys routinely disclose encroachments. Surveys can as easily determine setback violations on abutting properties. The records of the administrative entities are public records and thus, available; land records of adjacent lots are also available (they were clearly available in the present case—they are, for the most part, in the record); title insurance is likewise available in most instances; actions in ejectment, quia timet [29] and the like are available. If disputes arising from encroachments or setback violations lead to claims of adverse possession or an action for ejectment, the parties generally seek judicial review in an effort to remove any such clouds on title. The same can be done via declaratory judgment actions in respect to the factual applicability of zoning merger emanating from adjacent properties. The task, for competent title attorneys, is not insurmountable.

It would not be necessary as respondents speculate to trace title to an indefinite time for, as we have indicated, there are

---

**29.** "A legal doctrine that allows a person to seek equitable relief from future probable harm to a specific right or interest." BLACK'S LAW DICTIONARY 1281 (8th ed. 2004).

"[A]nd again, that equity will not allow a title, otherwise clear, to be clouded by a claim which cannot be enforced in law or equity." *Holland v. City of Baltimore,* 11 Md. 186, 197 (1857) (alteration added).

avenues which may be used to resolve the infrequent title questions that may arise. As petitioner suggests, DPS might revise its permit application to determine whether the subject lot is presently, or was formerly, held in common ownership with a contiguous lot. In the instant case, Lot 11 and Lot 12 apparently were still held by Mr. Duffie when Design–Tech obtained its building permit.[30]

### III. Conclusion

We find that Lot 11 and Lot 12 are merged for zoning purposes. Accordingly, we reverse the Board of Appeals' rejection of petitioner's contention that the building permit for Lot 11 was erroneously granted. Lot 11 and Lot 12 were under common ownership, and at the time of that common ownership, they were used in service to one another. The permit should not have issued, absent further zoning action. In order for Lot 11 to be utilized separate and apart from Lot 12, there would have to be a resubdivision of the combined lot, creating two lots both of which meet the requirements of both the zoning ordinance and the subdivision regulations. In that process it may well be necessary to seek zoning variances as to setbacks, or to remove the setback encroachments of the structure on Lot 12.

As we have found that Lot 11 and Lot 12 have merged for zoning purposes, we do not resolve the issue of whether the base level of the single-family home proposed by Design–Tech was a cellar or a basement. *See supra* note 1.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE DECISION OF THE BOARD OF APPEALS AND DIRECT THE BOARD TO ISSUE AN ORDER CONSIS-**

---

**30.** Design–Tech obtained a building permit in December 2002. The deed from Mr. Duffie to Design–Tech was executed in January 2003. At all times relevant hereto Design–Tech needed to have looked no farther than Mr. Duffie, its immediate predecessor in title, in order to assess the potential that zoning merger might have occurred.

TENT WITH OUR OPINION. COSTS TO PAID BY THE RESPONDENTS.